OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This action by a disappointed suitor against its competitor centers on a contest between two financial institutions to acquire the same target bank. Plaintiffs (collectively NBT) and defendants (collectively Nor star) each sought a merger with Central National Bank. NBT ultimately entered into a merger agreement with Central, subject to approval of two thirds of the holders of Central’s common stock. When the agreement failed to garner shareholder approval, NBT filed suit against Norstar, alleging several varieties of tortious interference and seeking lost profits from the failed merger. At issue on this appeal is whether NBT’s claim for tortious interference with contractual relations was properly dismissed on the pleadings (CPLR 3211) and whether its claim for tortious interference with prospective contractual relations was properly dismissed on summary judgment (CPLR 3212). Concluding that the Appellate Division correctly rejected both claims, we now affirm.
 

 
 *618
 
 Facts
 

 According to NBT’s complaint, on November 4, 1986 Central’s Board of Directors met with representatives of Norstar, NBT and a third financial institution — KeyCorp of Albany — to hear their separate merger proposals. At that meeting, NBT offered $54 a share for Central, and Key and Norstar each made offers worth $60 a share. Each of the proposals was based on an exchange of Central’s stock for the bidder’s stock. (NBT’s shares were unlisted; Norstar and Key traded on the New York Stock Exchange.) No action was taken by Central’s Board at that meeting. Three days later, the Board voted — six to five — to accept a revised merger proposal from NBT.
 

 NBT contends that prior to November 7, 1986, Norstar sold its own NBT holdings, representing a little over 4% of NBT’s outstanding shares, "dumping” them on the open market at a below-market price in an effort to discredit NBT’s merger proposal by creating the appearance that NBT’s shares were worth less than represented. Notwithstanding the alleged dumping, NBT and Central entered into a formal Merger Agreement on November 8, 1986, signed by Central’s president and the five directors who had voted for the merger. The merger was conditioned on approval both by the owners of two thirds of the common stock of Central and by the Comptroller of the Currency. The agreement further provided that Central’s officers and directors would use their best efforts to secure shareholder approval and that Central would not disseminate nonpublic information. Additionally the agreement contained a "fiduciary-out” provision, contemplating that Central might receive competing bids but that it would not initiate contact with anyone else in an effort to solicit another acquisition proposal and would notify NBT if it received any other offer.
 

 Thereafter, according to NBT’s complaint, Norstar covertly met with one of Central’s dissenting directors, Herbert Kling, and counseled him on how to oppose the merger by forming a stockholders’ committee. On December 1, 1986, Norstar’s president wrote to Central’s Board complaining about improprieties in the bidding process — specifically that the Board granted only NBT an opportunity to submit a revised offer and improperly overstated the value of NBT’s shares by 10%.
 

 Central’s management scheduled a stockholders’ meeting for June 10, 1987 to vote on the merger, filed its proxy statements with the SEC, and solicited proxies for the merger. A proxy contest ensued between management and the merger op
 
 *619
 
 ponents, in which Kling submitted copies of Norstar’s December 1, 1986 letter to local newspapers. This provoked a suit by NBT against Kling and his supporters for violation of Federal securities laws (see,
 
 NBT Bancorp v Kling,
 
 US Dist Ct, ND NY, 1987, 87-CV-493). Kling and his group countered by suing Central, its directors who had approved the merger and NBT, alleging breach of fiduciary duty and misrepresentations in the proxy materials (see,
 
 Kling v NBT Bancorp,
 
 US Dist Ct, ND NY, 1987, 87-CV-525).
 

 Two weeks before the June 10 meeting, NBT raised its offer to $66 per share. At a meeting on May 29,1987 to consider the new offer, Central’s Board received a letter from Norstar making a competing offer in excess of $66 per share. The Board then adjourned the June 10 meeting and withdrew its support for the Merger Agreement. Central and NBT agreed to terminate negotiations in exchange for a $150,000 payment to NBT, representing roughly half its expenses. To this day, Central remains independent.
 

 Close to a year later, NBT commenced this action asserting three causes of action and seeking tens of millions of dollars on each: that Norstar tortiously interfered with NBT’s contractual relations with Central, tortiously induced a breach of the Merger Agreement and tortiously interfered with NBT’s prospective business relations. Norstar’s dismissal motion pursuant to CPLR 3211 was granted in its entirety by Supreme Court. The Appellate Division affirmed dismissal of the first two causes of action on the ground that there was no breach of contract, an essential element of both causes of action. The court found that the Central Board did not solicit any competing offer or authorize any agent of Central to disseminate nonpublic information; that adjournment of the June 10 stockholders’ meeting did not constitute a breach, because failure to adjourn the meeting in the circumstances would have been inconsistent with the Board’s fiduciary duty to its stockholders; and that the actions of Kling did not constitute a breach, since the Merger Agreement could not bind dissenting directors acting independently (159 AD2d 902, 903-905). The court, however, reinstated the third cause of action (interference with prospective business relations).
 

 Dissenting in part, then-Justice Levine (joined by Justice Kane), would have dismissed the third cause of action as well, concluding that every wrongful means alleged in the complaint was either entirely proper and lawful or not a substantial factor in bringing about termination of the Merger Agreement.
 
 *620
 
 The dissent, however, would have also dismissed NBT’s first cause of action (tortious interference with prospective business relations) on the same basis, equating the cause of action for interference with the Merger Agreement — a voidable contract — with a claim for tortious interference with prospective business relations, requiring proof of wrongful means but not breach (159 AD2d at 911).
 

 After extensive discovery on NBT’s third cause of action, Norstar sought summary judgment on the ground that there was no evidence of wrongful conduct and no evidence that its conduct, even if wrongful, caused the stockholders to vote against the merger. Supreme Court granted the motion and the Appellate Division unanimously affirmed (215 AD2d 990), holding that there was no showing that Norstar’s conduct was wrongful. We now affirm.
 

 Analysis
 

 Insisting that Norstar should somehow stand liable for wrongfully interfering with its anticipated acquisition of Central, NBT’s complaint offers three variations on the theme: tortious interference with contractual relations, tortious inducement of a breach of contract and tortious interference with prospective business relations. In order to succeed on a cause of action for inducement of breach of contract a plaintiff obviously must show a breach of contract. NBT concedes there was no breach of the Merger Agreement and does not challenge dismissal of this claim. Rather, controversy centers on two issues: first, whether breach of contract is essential to a claim for tortious interference with contractual relations and second, whether there is a genuine issue of material fact regarding the use of wrongful means by Norstar. Wé consider each in turn.
 

 The Requirement of Breach
 

 NBT urges that, as a matter of precedent and policy, a defendant’s deliberate interference with plaintiffs contractual rights that causes damage should be punishable as tortious interference whether or not the contract was actually breached.
 

 New York law is to the contrary. Ever since tortious interference with contractual relations made its first cautious appearance in the New York Reports — decades after the seminal case
 
 Lumley v Gye
 
 (2 El & B1 216, 118 Eng Rep 749 [1853]) — our Court has repeatedly linked availability of the remedy with a breach of contract
 
 (see, Posner Co. v Jackson,
 
 223 NY 325;
 
 Lamb
 
 
 *621
 

 v Cheney & Son,
 
 227 NY 418). Indeed, breach of contract has repeatedly been listed among the elements of a claim for tortious interference with contractual relations
 
 (see, e.g., Gregoris Motors v Nissan Motor Corp.,
 
 80 AD2d 631, 632,
 
 affd
 
 54 NY2d 634;
 
 Inselman & Co. v FNB Fin. Co.,
 
 41 NY2d 1078,1080;
 
 Israel v Wood Dolson Co.,
 
 1 NY2d 116, 120;
 
 see also, Kronos, Inc. v AVX Corp.,
 
 81 NY2d 90, 94 [intentional inducement to breach or render performance impossible]).
 

 "Tortious interference,” however, can take many forms
 
 (see generally,
 
 Prosser, Torts § 129 [4th ed]). Even the subset of that amorphous category presented by this appeal — alleged interference with a contract by a competitor — presents a wide range of possibilities. As the Court made clear in
 
 Guard-Life Corp. v Parker Hardware Mfg. Corp.
 
 (50 NY2d 183, 193), the degree of protection available to a plaintiff for a competitor’s tortious interference with contract is defined by the nature of the plaintiffs enforceable legal rights. Thus, where there is an existing, enforceable contract and a defendant’s deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior
 
 (see, Israel v Wood Dolson Co.,
 
 1 NY2d at 119;
 
 cf., Foster v Churchill,
 
 87 NY2d 744 [decided today] [defense of economic justification]). Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant
 
 (see, Guard-Life,
 
 50 NY2d at 193-194).
 

 The policy reasons underlying these settled principles were fully explicated in
 
 Guard-Life.
 
 Two agreements were at issue in
 
 Guard-Life,
 
 the first an exclusive supply contract between plaintiff-importer and a supplier, to continue indefinitely subject to termination by either party on one year’s notice, the second plaintiff’s order for 12 monthly shipments. Defendant (plaintiff’s competitor) then successfully negotiated its own contract with the supplier, who immediately terminated its relationship with plaintiff, prompting plaintiff’s claim for tortious interference. We affirmed an award to plaintiff representing lost profits on cancellation of the 12-month order but otherwise granted summary judgment dismissing the complaint, concluding that there is no liability in tort with respect to an unenforceable contract — here a contract terminable at the will of either party — unless the means employed by defendant-competitor were wrongful.
 

 Guard-Life
 
 explains that this rule represents a balance struck between "society’s interest in respect for the integrity
 
 *622
 
 of contractual relationships, on the one hand, and, on the other, the right to freedom of action on the part of the party interfering and society’s concern that competition not be unduly hampered” (50 NY2d at 190). In fixing this balance, the focus is not on the defendant’s conduct but rather on the nature of the relationship that has suffered the interference. "[G]reater protection is accorded an interest in an existing contract (as to which respect for individual contract rights outweighs the public benefit to be derived from unfettered competition) than to the less substantive, more speculative interest in a prospective relationship (as to which liability will be imposed only on proof of more culpable conduct on the part of the interferer)”
 
 {id.
 
 at 191).
 
 [1]
 

 Thus,
 
 Guard-Life
 
 answers the "central question” posed by NBT: When C intentionally interferes with A’s contract with B, to A’s great harm, why should the identical conduct of C be unacceptable when B breaches and acceptable when B does not breach? Although the intentional interference by C may be the same whether or not A’s contract with B is actually breached, it is not C’s conduct that is the determinative factor in striking the balance and fixing the rule. Rather, the determinative factor is the nature of the relationship that suffered the interference, with greater protection accorded enforceable contract rights and greater deference accorded free competition where the contract rights are only prospective.
 

 Applying these principles, it is apparent that for NBT, consummation of the Merger Agreement represented no more than a hope that Central shareholders holding at least two thirds of the outstanding capital stock would in fact approve the transaction. The right NBT seeks to protect here — its expectation that Central Bank’s stockholders would approve the Merger Agreement — is thus not entitled to the same protection that would have been accorded a legally enforceable right to performance under that agreement
 
 (see, Jewel Cos. v Pay Less Drug Stores Northwest,
 
 741 F2d 1555 [9th Cir] [acquiring party only has a mere expectancy with respect to consummation of a merger in that the directors can only bind the corporation pending shareholder approval];
 
 Belden Corp. v InterNorth,
 
 
 *623
 

 Inc.,
 
 90 111 App 3d 547, 553, 413 NE2d 98, 102 [acquiring firm has a mere expectancy with respect to consummation of the merger]).
 

 Far from a negative, NET urges that the factual context of this case — the modern phenomenon of a contested merger— presents social policy considerations that favor our adoption of a more relaxed rule. NET argues that the unique nature of mergers — including the complexity of the transactions, the required regulatory approvals, and the proxy and solicitation requirements — supports dispensing with the requirement of breach or wrongful means. In the case of mergers, says NET, deliberate interference alone should suffice.
 

 No persuasive policy reason is advanced for such a limitation on competition or such a deviation from precedent, which would open lawful actions such as hostile tender offers and competing proxy solicitations to tortious interference claims by suitors disappointed in the marketplace. Indeed, "fiduciary-out” clauses such as existed in the present Merger Agreement contemplate the likelihood of competing bidders, and corporate directors have a fiduciary obligation to present higher offers to their shareholders. It is therefore hardly surprising that NET cites no case imposing the liability it advocates we sanction
 
 (see, by contrast, Viacom Intl. v Tele-Communications, Inc.,
 
 1994 WL 561377 [SD NY, Oct. 12,1994 (court refused to sustain the claim of tortious interference relating to the Viacom-Paramount merger where neither breach of the merger agreement nor wrongful means were pleaded)];
 
 Frandsen v JensenSundquist Agency,
 
 802 F2d 941, 947-948 [7th Cir 1986] [dismissing tortious interference action where there was no breach and no wrongful means];
 
 Jewel Cos. v Pay Less Drug Stores Northwest,
 
 741 F2d 1555, 1567-1569 [9th Cir 1984] [liability for interference with merger agreement possible where agreement breached]).
 

 Thus, we reject NBT’s policy arguments and stand by our considered precedents.
 
 [2]
 
 Our requirement of breach promotes the integrity of contract as well as integrity of the marketplace;
 
 *624
 
 it signifies the substantiality of the interest protected, and it conforms with this tort’s function as a back-up remedy for breaches of contract
 
 (see, Frandsen v Jensen-Sundquist Agency,
 
 802 F2d 941, 947). The requirement of wrongful means where only prospective rights are threatened honors free and lawful competition and accords an appropriate level of protection to a plaintiff’s interest — by definition not its contract rights — in its expectancy of future benefits.
 

 Wrongful Means
 

 We turn next to the issue of "wrongful means,” defined in
 
 Guard-Life
 
 as representing "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract” (50 NY2d at 191).
 

 NBT points to three acts of Norstar which it claims were wrongful: sale of NBT’s stock; the December 1, 1986 letter complaining about the bidding process; and the May 29, 1987 letter expressing a willingness to submit a new offer to compete with NBT’s revised bid. As to each, we agree with the trial court and the Appellate Division that no genuine issue of material fact was raised regarding this essential element of a claim for tortious interference with prospective business relations.
 

 Norstar sold two blocks of NBT stock in two arm’s length, fully disclosed transactions shortly before Central’s Board voted in favor of merger with NBT. The sales were made on the open market in Norstar’s "street name” to NBT’s lead market maker for the highest price offered. Norstar made a profit of more than $1.6 million on the sales; the transaction had no negative effect on NBT’s stock price; and NBT was fully aware of the sale. The determination was therefore correct that there was no triable issue regarding an effort to manipulate the market or misrepresent the value of NBT stock.
 

 NBT’s claim of wrongful means with respect to the two letters also lacks foundation in the record. As found, the December 1, 1986 letter was acknowledged by its recipient as an expression of pique at the rejection of Norstar’s bid; it was not sent to shareholders nor was it shown to be intended for
 
 *625
 
 public release; and it contained no actionable misrepresentation. And again as found, the May 29, 1987 letter was written to secure an economic advantage, not to injure plaintiffs, and it therefore constituted persuasion alone, not a malevolent act. There being no triable issue of fact regarding wrongful means, summary judgment was correctly granted dismissing NBT’s claim for interference with prospective contractual relations.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Judges Simons, Titone, Bellacosa, Smith and Ciparick concur; Judge Levine taking no part.
 

 Order affirmed, with costs.
 

 [1]
 

 . The
 
 Guard-Life
 
 holding, as well as its reasoning, put to rest NBT’s assertion that the Court in that case was adopting the test propounded in the Restatement (Second) of Torts § 766. "Wrongful means” were required for interference with prospective contractual relations, and the line of authority from
 
 Posner
 
 to
 
 Inselman,
 
 requiring breach for claims of tortious interference with contractual relations, was left undisturbed.
 

 [2]
 

 . The subject of tortious interference with contract continues to excite scholarly commentary, much of it suggesting that the tort be limited so as to protect lawful competition
 
 (see, e.g.,
 
 Perlman,
 
 Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine,
 
 49 U Chi L Rev 61 [1982] [the interference tort should be limited to cases in which defendant’s acts are independently unlawful];
 
 see also,
 
 Myers,
 
 The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law,
 
 77 Minn L Rev 1097 [1993] [tortious interference gives excessive
 
 *624
 
 protection at the expense of competition]; Dobbs,
 
 Tortious Interference with Contractual Relationships,
 
 34 Ark L Rev 335 [1980] [tort should be drastically limited]).