971 F.Supp. 78 (1997)
Frank GRAY, as President, and Joseph Rizzuto, as Business Manager and Financial Secretary of International Union of Operating Engineers, Local 14-14B, AFL-CIO and as Trustee of the Annuity, Pension, Welfare and Training Funds of International Union of Operating Engineers, Local 14-14B, AFL-CIO and John and Jane Doe, Beneficiaries of the Annuity, Pension, Welfare and Training Funds of International Union of Operating Engineers, Local 14-14B, AFL-CIO, Plaintiffs,
v.
GROVE MANUFACTURING COMPANY, a DIVISION OF KIDDE, INC. a/k/a Grove Worldwide and Grove North America, a Division of Kidde Industries, Inc., Defendants.
No. CV 96 3467 (RJD).
United States District Court, E.D. New York.
June 9, 1997.
*79 *80 James M. Steinberg, Stanley Q. Casey, Richardson Mahon Casey & Rooney, LLP, New York City, for Plaintiffs.
Eric A. Portuguese, Lester Schwab Katz & Dwyer, New York City, for Defendants.

MEMORANDUM & ORDER
DEARIE, District Judge.
Plaintiffs are the president of the International Union of Operating Engineers, Local 14-14B, AFL-CIO ("Local 14"), the business manager of Local 14 and trustee of Local 14's benefit plans, and unnamed beneficiaries of the benefit plans. Plaintiffs commenced this action against defendants Grove Manufacturing Company, et al. ("Grove") in New York state court seeking damages for tortious interference with contract and prima facie tort, and a permanent injunction. Grove removed the case to this Court on the ground that a federal question had arisen based on pre-emption by section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185. Grove has moved for summary judgment, arguing that it is entitled to judgment as a matter of law on the prima facie tort claim, that the action is pre-empted by federal law, and that Local 14 lacks standing. Grove also challenges the adequacy of the complaint with respect to the prima facie tort claim.

BACKGROUND
Plaintiff Local 14 and the General Contractors Association of New York ("GCA") are parties to a Collective Bargaining Agreement ("CBA"), pursuant to which a GCA employer must assign a member of Local 14 when it uses a rough terrain hydraulic crane (a "cherrypicker") with a load capacity of 36 tons or more ("cherrypicker provision"). CBA Art. IX, § 8(x) (Def. Notice of Motion, Exs. E-F). The CBA specifies mandatory grievance and arbitration procedures to resolve contract disputes. CBA Art. V, § 2. Last year, Local 14 demanded arbitration with one GCA member over that employer's alleged violation of the CBA's cherrypicker provision. See Pl. Mem. of Law at 8.
Grove manufactures Model RTG35 cherrypickers, some of which have been sold to GCA members. Def. Rule 3(g) Stmnt. ¶ 6. The complaint alleges that the RTG35 has a lift capacity of 45 tons. Amended Compl. ¶ 25. The first cause of action alleges that Grove, acting in concert with GCA members, tortiously interfered with the CBA by marketing the RTG35 as a 35 ton cherrypicker, thus obviating the need for the employer to assign a Local 14 member as an additional worker, as required by the cherrypicker provision. Id. ¶¶ 29, 31. Based on the same factual predicate, the second cause of action seeks recovery for prima facie tort, id. ¶¶ 37-39, and the third cause of action requests an injunction restraining Grove from selling the RTG35 in New York City. Id. ¶¶ 42-43.
Grove submits a sales director's affidavit stating that the RTG35 has a maximum lift capacity of 35 tons, and that Grove manufactures the cherrypicker for business reasons  to satisfy market demand and to earn a profit. Minnich Aff. At oral argument, Grove argued that determining the cherrypicker's lift capacity implicates OSHA regulations, industry standards, and custom and usage, among other considerations.
The complaint alleges that Local 14 members have lost employment, wages and benefits, and that Local 14's benefit plans have been deprived of benefit contributions as a result of Grove's wrongful acts. Amended Compl. ¶¶ 33, 37, 42. Plaintiffs seek $15,000,000 in damages. Id. ¶¶ 34, 40.

DISCUSSION

1. Prima Facie Tort
Grove contends that plaintiffs have failed to state a cause of action for prima facie tort because they have not pleaded special damages. Grove also seeks summary judgment *81 on this claim because plaintiffs have failed to properly support their allegation of Grove's disinterested malevolence. Def. Mem. of Law at 19-21. The Court agrees on both points.
Under New York law, the elements of a prima facie tort are "(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be unlawful." Curiano v. Suozzi, 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984). Pleading special damages requires "a particularized statement of the reasonable, identifiable and measurable" loss. Nu-Life Constr. Corp. v. Bd. of Educ. of New York City, 204 A.D.2d 106, 108, 611 N.Y.S.2d 529 (1st Dep't 1994); see also Starishevsky v. Parker, 225 A.D.2d 480, 480, 639 N.Y.S.2d 377 (1st Dep't 1996) (wages and benefits must be identifiable). Round figures with no itemization do not satisfy the requirement of pleading special damages. Gay v. Carlson, No. 89-CIV-4757, 1992 WL 309819, at * 10 (S.D.N.Y. Oct.15, 1992), aff'd in part, 60 F.3d 83 (2d Cir.1995).
At oral argument, plaintiffs conceded that their prima facie tort cause of action must fail because they have not pleaded special damages adequately. Plaintiffs allege in general terms that Local 14 members lost "employment, wages and benefits" and Local 14 benefit funds lost contributions. Amended Compl. ¶ 37. A lump sum damages amount of $15,000,000 is claimed, with no attempt at itemization or specificity. See id. ¶ 40.
Also fatal to plaintiffs' prima facie tort claim is their failure to raise a genuine issue of fact that "disinterested malevolence" was the "sole motive" for Grove's actions, a required element of prima facie tort under New York law. See Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 333, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983). The amended complaint alleges that Grove "lack[s] justification for unlawfully and intentionally causing harm to Plaintiffs' commercial interests." Amended Compl. ¶ 38. In support of its summary judgment motion, Grove submits an affidavit by its sales director, stating that RTG35 cherrypickers were sold to meet a market need, and that Grove had realized a profit on the sales. Minnich Aff.
Rule 56(e) requires that once the moving party provides evidentiary support for its position, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e). On an issue upon which the plaintiff bears the burden of proof, mere allegation of a factual dispute, without any evidentiary support, is insufficient to defeat a summary judgment motion. Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir.1994). Plaintiffs' conclusory assertion that Grove lacked justification for its actions will not defeat Grove's motion.
The Court grants Grove's motion to dismiss the prima facie tort cause of action.

2. Section 301 Pre-emption
Grove urges the Court to grant its summary judgment motion and dismiss plaintiffs' complaint because the state law claims, which require interpretation of the CBA, are preempted by § 301 of the LMRA, 29 U.S.C. § 185. Def. Mem. of Law at 8. Plaintiffs respond that pre-emption is not warranted because the Court does not have § 301 jurisdiction over Grove because Grove is a nonsignatory to the CBA. Pl. Mem. of Law at 2.
While LMRA pre-emption and jurisdiction are often subject to similar analysis, lack of jurisdiction does not preclude preemption, and pre-emption does not necessarily imply a federal claim. See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 105 S.Ct. 1904, 1915-16, 85 L.Ed.2d 206 (1985) (when state law claim is dependent on CBA interpretation, it "must either be treated as a § 301 claim ... or dismissed as pre-empted by federal labor-contract law") (internal citation omitted); Greenblatt v. Delta Plumbing & Heating Corp., 68 F.3d 561, 572 (2d Cir. 1995) (litigant "is too quick in assuming that pre-emption necessarily leads to federal jurisdiction"); Int'l Union, United Mine Workers v. Covenant Coal Corp., 977 F.2d 895, *82 897-99 (4th Cir.1992) (no § 301 jurisdiction over tortious interference claim against nonsignatory, but § 301 pre-empts state law claim).
Section 301(a) of the LMRA provides, in pertinent part, that
suits for violation of contracts between an employer and a labor organization ... may be brought in any district court of the United States having jurisdiction of the parties....
29 U.S.C. § 185. The Supreme Court's interpretation of the scope of § 301 pre-emption has been broad, but recently has shown signs of narrowing. In Textile Workers Union v. Lincoln Mills, the Supreme Court directed federal courts to develop a body of federal substantive law pursuant to § 301 to enforce collective bargaining agreements. 353 U.S. 448, 456-57, 77 S.Ct. 912, 917-18, 1 L.Ed.2d 972 (1957); see also Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-04, 82 S.Ct. 571, 576-77, 7 L.Ed.2d 593 (1962) ("the subject matter of § 301 is particularly one that calls for uniform law ... in enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules") (internal quotations and citations omitted). In order to achieve a comprehensive, unified body of federal law governing labor contracts, the Supreme Court has stated that
if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is preempted and federal labor-law principles  necessarily uniform throughout the Nation  must be employed to resolve the dispute.
Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988); see also Lucas Flour, 369 U.S. at 103, 82 S.Ct. at 576-77 (application of state law to construe collective bargaining agreements "would inevitably exert a disruptive influence upon both [their] negotiation and administration").
To achieve Congress' goal of uniform interpretation of labor contracts, the pre-emptive force of § 301 "must extend beyond suits alleging contract violations" to include state law claims that are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." Allis-Chalmers, 471 U.S. at 210, 220, 105 S.Ct. at 1911, 1916. Thus, if the "evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract," the state law claim is preempted. Id. at 213, 105 S.Ct. at 1912. The issue is "whether [the state law claim] would frustrate the federal labor-contract scheme established in § 301." Id. at 209, 105 S.Ct. at 1910. The Allis-Chalmers Court emphasized the limits of its decision, cautioning that "not every dispute ... tangentially involving a provision of a collective-bargaining agreement [] is pre-empted by § 301...." Id. at 211, 105 S.Ct. at 1911. Rather, "[t]he full scope of the pre-emptive effect of labor-contract law remains to be fleshed out on a case-by-case basis." Id. at 220, 105 S.Ct. at 1916.
Lingle distinguished Allis-Chalmers, and held that a retaliatory discharge claim was not pre-empted because the task of proving the state law tort was "independent" of rights under the collective bargaining agreement; that is, a court did not need to interpret labor contract provisions that permitted discharge for just cause. Lingle, 486 U.S. at 407, 108 S.Ct. at 1882. The Supreme Court noted that pre-emption was not warranted even though the state law proceeding and the labor contract arbitration would examine the same set of facts, "as long as the state-law claim can be resolved without interpreting the agreement itself." Id. at 409-10, 108 S.Ct. at 1883. Lingle reiterated the governing principle of pre-emption: "an application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-bargaining agreement." Id. at 413, 108 S.Ct. at 1885; see also Shafii v. British Airways, PLC, 83 F.3d 566, 569-70 (2d Cir.1996) (state law claims not pre-empted by Railway Labor Act because their resolution does not involve interpretation of labor contract).
A recent unanimous Supreme Court decision, Livadas v. Bradshaw, spoke to the *83 scope of the Court's pre-emption doctrine, noting that "the pre-emption rule has been applied only to assure that the purposes animating § 301 will [not] be frustrated [] by state laws purporting to determine `questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement.'" 512 U.S. 107, 122-23, 114 S.Ct. 2068, 2078, 129 L.Ed.2d 93 (1994), (quoting Allis-Chalmers, 471 U.S. at 211, 105 S.Ct. at 1911). Furthermore, merely consulting the labor contract in the course of the state law action, without the necessity of interpreting provisions, does not warrant pre-emption. Id., 512 U.S. at 124, 114 S.Ct. at 2078-79[1] (citing Lingle, 486 U.S. at 413 n. 12, 108 S.Ct. at 1885 n. 12); Hernandez v. Conriv Realty Associates, No. 96-7561, 116 F.3d 35, 39-41 (2d Cir.1997) (need to refer to labor contract for rate of pay and damages does not support pre-emption).
An important principle, related to the goal of a uniform body of federal labor law, that is safeguarded by the pre-emption doctrine is the strong federal labor law policy favoring arbitration as a means of resolving labor disputes. See Republic Steel Corp. v. Maddox, 379 U.S. 650, 652-53, 85 S.Ct. 614, 616-17, 13 L.Ed.2d 580 (1965); 29 U.S.C. § 173(d) ("[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes ..."). Since most collective bargaining agreements contain an arbitration provision that governs contract disputes, the Supreme Court's pre-emption doctrine has been animated by the concern that "the arbitrator's role could be bypassed easily if § 301 is not understood to pre-empt" state law claims that require an interpretation of the meaning of a labor contract. Allis-Chalmers, 471 U.S. at 219, 105 S.Ct. at 1915; see also Livadas, 512 U.S. at 123, 114 S.Ct. at 2078 (pre-emption ensures that parties will not "renege on their arbitration promises by `relabeling' as tort suits actions simply alleging breaches of duties assumed in collective-bargaining agreements"); Lingle, 486 U.S. at 411, 108 S.Ct. at 1884 ("interpretation of collective-bargaining agreements remains firmly in the arbitral realm"). Section 301 pre-emption assures that in the context of a labor contract with an arbitration clause, an arbitrator, not a court, will have the first opportunity to interpret the disputed provision. Allis-Chalmers, 471 U.S. at 220, 105 S.Ct. at 1915-16; Martin v. Shaw's Supermarkets, Inc., 105 F.3d 40, 42 (1st Cir.1997) (primacy of arbitration in interpreting labor contract).
The fact that a claim is brought against a nonsignatory to the collective bargaining agreement should not weaken the force of the argument. A court may direct a party to arbitrate with its contractual partner before seeking judicial redress against a nonsignatory party pursuant to § 301. Wilkes-Barre Publ'g Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372, 383 (3d Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982); Bill v. Casarona, No. 95-CIV-2857, 1996 WL 389304, at *3 (S.D.N.Y. July 11, 1996); Ghartey v. Saint John's Queens Hosp., 745 F.Supp. 125, 128 (E.D.N.Y.1990).
Applying the standard set out in Supreme Court precedent, many courts have found § 301 pre-emption of tortious interference claims, whether the relief sought is monetary or injunctive, because resolution of the state law claim requires construing the underlying collective bargaining agreement.[2]See, e.g., Covenant Coal, 977 F.2d at 899 (tortious interference claim pre-empted because resolution "would require a court to interpret the collective bargaining agreements"); Johnson v. Anheuser Busch, Inc., 876 F.2d 620, 624 (8th Cir.1989) ("tortious interference [claim] ... requires an examination of the collective bargaining agreement" and is pre-empted); Bill, 1996 WL 389304, at *3 (analysis of tortious interference claim requires determination of whether underlying contract was *84 breached and claim is pre-empted); Grant v. Simpson Metal Indus., No. 93-CV-1154, 1995 WL 129184, at *3 (E.D.N.Y. March 13, 1995) (pre-emption of claim for intentional interference with business relations because claim contingent on "review [of] provisions detailed in the collective bargaining agreement"). The specific provisions that would have to be interpreted have included clauses dealing with "just cause" discharge, Johnson, 876 F.2d at 624; Bill, 1996 WL 389304, at *3, anti-discrimination and hiring obligations, Grant, 1995 WL 129184, at *3, and general terms and conditions of union-based operations, Covenant Coal, 977 F.2d at 896.
Although the Second Circuit has not had occasion to consider § 301 pre-emption of a tortious interference claim, the Second Circuit has held that the Railway Labor Act ("RLA") pre-empts a tortious interference claim because proof of breach of the underlying contract, specifically a provision allegedly providing for employment for life, is necessary in order to recover in tort.[3]Baylis v. Marriott Corp., 906 F.2d 874, 877 (2d Cir. 1990). The Supreme Court in Hawaiian Airlines, Inc. v. Norris noted that the preemption standard under the RLA is identical to that under the LMRA, and quoted Lingle's analysis to determine the scope of RLA pre-emption.[4] 512 U.S. 246, 260-62, 114 S.Ct. 2239, 2247-49, 129 L.Ed.2d 203 (1994).
At first glance, the dispute in the instant case involves a highly discrete, purely factual determination of the lift capacity of Grove's RTG35 cherrypicker, the resolution of which poses no threat to the uniformity of federal labor law or the federal labor contract scheme established by § 301. After all, does a body of federal common law of labor relations have anything to contribute to the question of a cherrypicker's lift capacity? Pre-empted tortious interference claims have involved labor contract provisions that implicate the very core of management-labor relations, such as dismissal for "just cause," anti-discrimination, hiring obligations, and employment for life clauses. See Covenant Coal, 977 F.2d at 896, Baylis, 906 F.2d at 875; Johnson, 876 F.2d at 624; Bill, 1996 WL 389304, at *3; Grant, 1995 WL 129184, at *3. If, as Allis-Chalmers instructed, LMRA pre-emption doctrine is to develop on a case-by-case basis, this is a case that does not appear to implicate important provisions of federal labor law, and the claims should not be pre-empted.
However, a more penetrating analysis of the state law claims in this case leads this Court to conclude that § 301 pre-emption does apply. First, while Supreme Court pre-emption doctrine has shifted and narrowed somewhat in recent decisions, at least this mandate is unequivocal: where the state law claim requires interpreting the terms of a labor contract, pre-emption follows. Livadas, 512 U.S. at 123-24, 114 S.Ct. at 2078-79; Lingle, 486 U.S. at 413, 108 S.Ct. at 1885; Allis-Chalmers, 471 U.S. at 213, 105 S.Ct. at 1912. In the instant case, litigating the tortious interference claim will necessitate proving that the CBA between Local 14 and the GCA was breached. See NBT Bancorp, 87 N.Y.2d at 621, 641 N.Y.S.2d 581, 664 N.E.2d 492. In other words, the factfinder would have to construe the labor contract provision that directs the assignment of a Local 14 member to cherrypickers with lift capacity of 36 tons or more. The tortious interference claim is not "independent" of rights set out in the CBA, in the sense that the resolution of the claim requires a purely factual inquiry that does not implicate the meaning of a labor contract provision. See Lingle, 486 *85 U.S. at 407, 108 S.Ct. at 1882. Nor is this a case that requires mere consultation of the CBA in the course of litigating the state tort. See Livadas, 512 U.S. at 124, 114 S.Ct. at 2078-79.
Second, the disputed contractual provision does implicate the very heart of federal labor law  "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement." See Allis-Chalmers, 471 U.S. at 211, 105 S.Ct. at 1911. A determination of whether the cherrypicker provision was breached will likely involve analysis of OSHA provisions, industry standards, contractual intent of labor and management, work assignment, and the like. Viewed from this more inclusive perspective, the cherrypicker provision is not just a dispute about technical measurement, but rather, it involves the central labor-management concern of conditions for employing union members. Claims involving contractual intent and employee assignment belong to the category of "disputes traditionally resolved through arbitration." See id. at 219, 105 S.Ct. at 1915.
Which brings the Court to the third, and perhaps most salient, point  that pre-emption is necessary in this case to "preserve the effectiveness of arbitration." See id. A provision in the CBA governing relations between Local 14 and the GCA mandates grievance and arbitration procedures for "any claims of violation of this Agreement, or of any dispute or breach that may arise in connection therewith, or for construing the terms and provisions thereof." CBA Art. V, § 2. It is not contested that the dispute over the load capacity of the RTG35 cherrypicker falls within the scope of the arbitration clause. Indeed, plaintiff Local 14 has demanded arbitration with a GCA member over its use of the RTG35 without assigning a Local 14 member. Pl. Mem. of Law at 8. By bringing this action against Grove, Local 14 is circumventing mandatory grievance procedures to which it agreed, or at least trying to get two bites at the same apple. Even though plaintiffs have brought this action against Grove, a nonsignatory to the CBA, courts have invoked the exhaustion requirement to require a litigant to arbitrate with a signatory party before proceeding against a third party. See Wilkes-Barre, 647 F.2d at 383; Bill, 1996 WL 389304, at *3; Ghartey, 745 F.Supp. at 128.
The Court grants Grove's summary judgment motion on the tortious interference claim and the claim seeking a permanent injunction because plaintiffs' state law claims are pre-empted by § 301 of the LMRA.

Conclusion
For the reasons stated above, the Court dismisses plaintiffs' prima facie tort claim and finds that plaintiffs' remaining claims are not cognizable as state law causes of action because they are pre-empted by federal law.[5]
The Court acknowledges that when a state law claim is found to be pre-empted by § 301, it must either be dismissed or "treated as a § 301 claim." Allis-Chalmers, 471 U.S. at 220, 105 S.Ct. at 1916. While plaintiffs may attempt to assert their tortious interference claim against Grove as arising under § 301, such a move will require the Court to consider the question of the union's standing, § 301 jurisdiction over nonsignatories, and the union's failure to exhaust grievance procedures with the GCA.
SO ORDERED.
NOTES
[1] In a footnote, the Livadas Court observed that lower courts have been confused in their interpretation and application of the Court's pre-emption doctrine. 512 U.S. at 124 n. 18, 114 S.Ct. at 2078 n. 18.
[2] Because plaintiffs' prima facie tort claim is dismissed for failure to plead adequately and support the claim, see section 1, supra, the Court does not address the question of § 301 pre-emption of the prima facie tort cause of action.
[3] Under New York law, an element of a claim for tortious interference with contract is a breach of the underlying contract. See, e.g., G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 767 (2d Cir.), cert. denied, ___ U.S. ___, 116 S.Ct. 381, 133 L.Ed.2d 304 (1995); NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc., 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996).
[4] In light of Norris, the Second Circuit cautioned that its expansive analysis of RLA pre-emption, such as that articulated in Baylis, must be reexamined. Gay v. Carlson, 60 F.3d 83, 87 (2d Cir.1995) (following Norris to hold that prima facie tort claim not defeated by RLA). The Gay court emphasized, following Supreme Court precedent, that no RLA pre-emption is warranted where the claims asserted are rooted solely in state law and no interpretation of labor contract provisions is required, but mere reference may have to be made to the labor contract. 60 F.3d at 87-88.
[5] The Court need not consider plaintiff Local 14's standing to sue in federal court because the case is not being litigated in a federal forum. See Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 343 (1975) (federal law limitations on standing apply to proceedings in federal court). Rather, plaintiffs initiated a state court action on the basis of state law claims, which were removed to this Court, and the Court now holds that plaintiffs' claims are pre-empted by federal law.