[888 NYS2d 489]

Amaranth LLC et al., Appellants-Respondents, v J.P. Morgan Chase & Co. et al., Respondents, and J.P. Morgan Futures, Inc., Respondent-Appellant.

First Department, November 5, 2009

**APPEARANCES OF COUNSEL**

*Kleinberg, Kaplan, Wolff & Cohen, P.C.*, New York City (*Marc R. Rosen* and *David Parker* of counsel), and *Bartlit Beck Her-*

*man Palenchar & Scott LLP*, Chicago, Illinois (*James B. Heaton, III,* of the Illinois bar, admitted pro hac vice, of counsel), for appellants-respondents.

*Paul, Weiss, Rifkind, Wharton & Garrison, LLP*, New York City (*Mark F. Pomerantz, Eric S. Goldstein* and *Daniel J. Toal* of counsel), for respondents and respondent-appellant.

### OPINION OF THE COURT

CATTERSON, J.

The instant appeal arises from events that the Wall Street Journal in January 2007 described as "the biggest hedge fund failure ever." To stem billions of dollars in losses in 2006, Amaranth LLC executed trades to transfer its high-risk positions to the parent company of its clearing broker, J.P. Morgan, which received substantial benefits from the transaction. Both parties appeal from portions of an order that, inter alia, dismissed Amaranth's claims for tortious interference and denied J.P. Morgan's motion for dismissal of a claim for breach of contract. We find that the plaintiffs did not plead a valid cause of action for breach of contract, but that Amaranth LLC's claim for tortious interference should be reinstated.

The plaintiffs are Amaranth LLC (hereinafter referred to as the Fund), a hedge fund involved in natural gas derivatives trading, and Amaranth Advisors LLC (hereinafter referred to as Advisors), the trading advisor that planned and executed the Fund's investment strategy. The defendants J.P. Morgan Futures, Inc. (hereinafter referred to as JPMFI), the Fund's clearing broker, and J.P. Morgan Chase Bank, N.A. (hereinafter referred to as JPMB) are subsidiaries of defendant J.P. Morgan Chase & Co. (hereinafter referred to as JPMC).

The following facts are undisputed:

In 2005 and 2006, the Fund made huge gains trading in energy derivatives, reaching a value of $9.2 billion in July 2006. However in late August 2006, the Fund lost hundreds of millions of dollars, and by September 15, 2006, it was in danger of being unable to satisfy its obligations on its open trading positions. As the Fund's clearing broker, JPMFI was, effectively, the guarantor for trades if the Fund defaulted. To shield clearing brokers from ultimate responsibility for their clients' losses, exchange regulations require commodities traders to maintain funds as a deposit for performance on their contracts. These funds are known as margin. A client's account is recalculated at the end of every business day and the resultant gains or losses

reflected in the client's account balance. When losses accrue, they are deducted from the client's balance and the client may be required to post additional margin funds. This is known in the industry as a margin call. This process ensures that the account has sufficient funds to satisfy margin requirements and provide adequate protection for clearing brokers against their clients' positions.

The relationship between the Fund and JPMFI is established in the Client Agreement executed by the parties in 2004. The agreement states in relevant part:

> "[¶ 3] (e) All transactions by JPMFI on behalf of [the Fund] shall be subject to the applicable constitution, by-laws, rules, regulations, customs, usages, rulings, and interpretations of the exchange and its clearing organization . . . JPMFI shall not be liable to [the Fund] as a result of any action taken by JPMFI or its agents to comply with any such Rule . . .

> "(f) JPMFI shall not be required to execute any new order for [the Fund] if, in JPMFI's reasonable discretion, the state of [the Fund's] account does not justify such execution; provided, however, that JPMFI shall execute orders that would have the effect of reducing JPMFI's exposure to [the Fund], and such [sic] and provided further that such execution would not violate any exchange or regulatory rule or applicable law."

At the close of business on Friday, September 15, 2006, the Fund's margin requirement was $2.513 billion. At the time, the Fund had $2.518 billion in its futures account at JPMFI, leaving it with just $5 million in unencumbered cash.

To protect themselves from further losses that could threaten the Fund's survival, the plaintiffs sought to transfer the risk associated with the Fund's natural gas portfolio to other banks or funds. On Saturday, September 16, the Fund reached a deal under which Merrill Lynch (hereinafter referred to as Merrill) would assume about a quarter of the Fund's open natural gas positions. These trades were cleared through JPMFI the next business day, Monday, September 18, without incident.

At the same time, the Fund was in negotiations with Goldman Sachs (hereinafter referred to as Goldman) to transfer most of their remaining open positions. On Sunday, September

17th, the Fund reached a deal with Goldman under which Goldman would accept a payment of $1.85 billion to assume most of the remaining risk in the Fund's portfolio. Unlike the Merrill deal, Goldman required this payment in advance. The Fund had little unencumbered cash on hand, and the Goldman deal would necessarily require the release of its margin funds to complete the deal.

The proposed trade was discussed in a conference call the next morning, Monday, September 18, among officials from Advisors, Goldman, JPMFI, and the New York Mercantile Exchange (hereinafter referred to as NYMEX). Despite the endorsement of the NYMEX officials, JPMFI refused to release the necessary $1.85 billion from the Fund's margin account. As a result, the deal with Goldman fell through.

Later that Monday, Advisors was contacted by Citadel Investment Group LLC (hereinafter referred to as Citadel). Negotiations with Citadel led to a similar deal, in which Citadel would receive $1.85 billion as a concession for taking on most of the Fund's remaining risk. The only differences were that Citadel would accept payment after the trade was executed and that the Fund would absorb two thirds of the losses from Monday's trading.

However, the plaintiffs allege that, on Tuesday, September 19, 2006, two executives for JPMC, Steve Black and Bill Winters, called Citadel and told it that "Amaranth is not as solvent as they are telling you they are." The plaintiffs further allege that JPMC was displeased that the Fund was negotiating with other firms instead of JPMC, and that in making the false statement, Mr. Black and Mr. Winters intentionally and maliciously sought to derail the trade between the Fund and Citadel.

It is undisputed that Citadel declined to pursue the deal with the Fund. The Fund claims that as a result it sustained over $1 billion in losses and Advisors claims that it suffered severe losses as well. Following the collapse of the Citadel deal, the Fund reached an agreement for JPMC to take on the risky positions in exchange for a payment of $2.5 billion.

On or about November 13, 2007, the Fund and Advisors commenced the instant action against JPMC and its subsidiaries alleging, inter alia, a breach of contract on the grounds that JPMFI was obligated to release margin funds for the Goldman deal under paragraph 3 (f) of the Client Agreement because it would have decreased JPMFI's exposure. The complaint also contained an allegation of tortious interference with prospective

economic advantage under Connecticut law by the Fund against JPMC, and a similar tortious interference claim by Advisors.

On or about March 3, 2008, JPMC and its subsidiaries moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7). The plaintiffs opposed the motion arguing that they had adequately pleaded their complaint, and that the documentary evidence presented by the defendants merely raised issues of fact for trial.

The motion court observed that under CPLR 3211 (a) (7) the relevant inquiry is whether the plaintiffs' complaint states a valid cause of action on its face, giving the plaintiffs the benefit of every possible favorable inference. (See Leon v Martinez, 84 NY2d 83, 87-88 [1994].) The court quoted Asgahar v Tringali Realty, Inc. (18 AD3d 408, 409 [2d Dept 2005]) for the proposition that where the defendants have presented documentary evidence the court must determine whether the plaintiff actually "has a cause of action, not whether [he or] she has stated one." (2008 NY Slip Op 33544, *7; see also CPLR 3211 [a] [1].)

Supreme Court denied the motion to dismiss the Fund's claim for breach of contract against JPMFI, finding that the documentary evidence submitted by the defendants did not conclusively establish that the Goldman deal would not have reduced JPMFI's exposure, in which case JPMFI would have been obligated to carry out the deal.

The motion court dismissed both claims for tortious interference. The court held that, even though the plaintiffs alleged economic harm, the fact that they asserted that harm was done to their reputation required the application of the one-year statute of limitations applicable to defamation claims. Therefore, it found the Fund's claim for tortious interference to be time-barred. It also found that the claim asserted by Advisors against JPMC failed to allege either that Advisors was defamed or that it had a business relationship with JPMC that could support a claim for tortious interference.

Finally, the motion court considered claims under the Connecticut Unfair Trade Practices Act, and determined that it did not apply to the instant case under the appropriate choice of law rules. We uphold this element of the ruling.

■ For the reasons set forth below, we find that the court erred in holding that the plaintiffs stated a claim for breach of contract because paragraph 3 (f) of the aforementioned Client Agreement required JPMFI to reduce its exposure to the Fund.

In fact, the plain language of paragraph 3 (f) establishes that the plaintiffs had no contractual right to demand that JPMFI increase its risk.

It is well settled that "a court should not adopt an interpretation which will operate to leave a provision of a contract . . . without force and effect." (*FCI Group, Inc. v City of New York*, 54 AD3d 171, 177 [1st Dept 2008], *lv denied* 11 NY3d 716 [2009] [internal quotation marks and citation omitted].) In interpreting paragraph 3 (f) of the Client Agreement, we find that it explicitly grants JPMFI the right to refuse execution of those deals that would expose JPMFI to additional risk, irrespective of whether they are good or bad transactions for the Fund, while placing some limit on its ability to refuse. Therefore, JPMFI must have been able to refuse to execute transactions that posed *any* risk to it even if these had a high likelihood of reducing its exposure in the long term; otherwise paragraph 3 (f) would be rendered meaningless.

It is immaterial whether the Goldman deal, taken as a whole, was likely or unlikely to decrease the exposure of JPMFI to the plaintiffs because JPMFI was not presented with the completed deal. Rather, the Fund requested the release of margin in anticipation of further transactions that were arguably likely to decrease JPMFI's exposure and the Fund's risk. However, the plaintiffs' complaint admits that *this first step would expose JPMFI to an "overnight settlement risk of $1.85 billion"* (emphasis added). Whether it was prudent or not for JPMFI to take this chance is not relevant in finding that JPMFI was under no contractual obligation to expose itself to this or any additional risk, irrespective of what the result of its refusal might be. Because the plaintiffs, in their complaint, admit that JPMFI would be more exposed as an immediate result of the release of margin, they have failed to plead a cause of action for breach of contract. Therefore, we dismiss that claim.

Dismissal is also warranted under CPLR 3211 (a) (1) based on documentary evidence presented by the defendants including the full Client Agreement and excerpts from the NYMEX and Intercontinental Exchange Rules. Paragraph 3 (e) of the Client Agreement provides that "[a]ll transactions by JPMFI on behalf of [the Fund] shall be subject to the applicable constitution, by-laws, rules, regulations, customs, usages, rulings, and interpretations of the exchange." The relevant exchange rules require that the minimum margin be maintained at all times in trading accounts. For example, NYMEX rule 4.01 (F) provides that

"[w]ithdrawals of margin from a customer's account may only be permitted by a Member Firm carrying such account if the remaining funds in such account are equal to or in excess of the then prevailing initial margin required of the applicable open positions."

At the time the Fund requested the release of its margin, it had only $5 million excess margin in its account, with a minimum margin requirement of approximately $2.514 billion. The release of $1.85 billion would, therefore, place the Fund below its margin requirements under the rules of NYMEX. Although the plaintiffs argue that this is irrelevant because the margin would be replaced the next day, rules require that adequate margin be maintained *at all times*. Therefore, the Fund fails to allege that the release of margin would not violate the rules of the exchange as incorporated into the Client Agreement. Thus, even if the Goldman deal would have the effect of reducing JPMFI's exposure, the plaintiffs have failed to allege a cause of action for breach of contract. (*See Asgahar*, 18 AD3d at 409.)

We turn next to counts two and four of the plaintiffs' complaint alleging tortious interference with prospective economic advantage. To prevail on a claim for tortious interference with business relations in New York, a party must prove (1) that it had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) that the defendant's interference caused injury to the relationship with the third party. (*See Carvel Corp. v Noonan*, 3 NY3d 182, 189 [2004]; *NBT Bancorp v Fleet/Norstar Fin. Group*, 87 NY2d 614 [1996]; *Guard-Life Corp. v Parker Hardware Mfg. Corp.*, 50 NY2d 183 [1980].)

Defamation is a predicate wrongful act for a tortious interference claim. (*See Stapleton Studios, LLC v City of New York*, 26 AD3d 236 [1st Dept 2006].) The motion court found that because the alleged defamation caused reputational injury to the Fund, the allegations sounded in defamation and were subject to a one-year statute of limitations. (*See* CPLR 215 [3].) We disagree.

It is well settled that "[i]n applying a Statute of Limitations . . . '[w]e look for the reality, and the essence of the action and not its mere name.'" (*Morrison v National Broadcasting Co.*,

19 NY2d 453, 459 [1967], quoting *Brick v Cohn-Hall-Marx Co.*, 276 NY 259, 264 [1937].) The three-year statute of limitations for tortious interference applies when the gravamen of a complaint is economic injury, rather than merely reputational harm. (*See Mannix Indus. v Antonucci*, 191 AD2d 482, 483 [2d Dept 1993], *lv dismissed* 82 NY2d 846 [1993]; *Classic Appraisals Corp. v DeSantis*, 159 AD2d 537 [2d Dept 1990].)

In *DeSantis*, the Court found that the plaintiff's complaint sounded in tortious interference when it alleged that the defendant's conduct had interfered with prospective appraisal contracts. (159 AD2d at 537.) In contrast, in *Pasqualini v MortgageIT, Inc.* (498 F Supp 2d 659 [SD NY 2007]), when the plaintiff alleged harm to her professional reputation that had an indirect effect on her ability to form business relationships, the court found that the complaint sounded in defamation and applied the associated one-year statute of limitations. (*Id.* at 669-671.) The instant case more closely resembles *DeSantis* as the plaintiffs have alleged a specific business relationship—the prospective deal between the Fund and Citadel—that has been harmed. Because the complaint does not rely merely on generalized reputational harm, we find that it sounds in tortious interference. Therefore, the plaintiffs' complaint was timely under the applicable three-year statute of limitations.

■ Moreover, we find that the Fund has adequately pleaded the elements of tortious interference with prospective economic advantage (the second cause of action). It is well settled that where a statement impugns the basic integrity or creditworthiness of a business, an action lies and injury is conclusively presumed. (*See John Langenbacher Co. v Tolksdorf*, 199 AD2d 64 [1st Dept 1993].) Thus, the argument that the alleged statement, which disparages the Fund's solvency and possibly Advisors' honesty in business, is nonactionable opinion is without merit. The alleged statement has a precise meaning, and whether or not the Fund was solvent at the time the statement was made is a fact capable of being proven true or false by a factfinder. The Fund pleads the underlying defamation with the required specificity, setting forth the particular words that were said, who said them and who heard them, when the speaker said them, and where the words were spoken. (*See* CPLR 3016 [a]; *Dillon v City of New York*, 261 AD2d 34, 37-38 [1st Dept 1999].) Finally, the Fund sufficiently pleads injury and causation. Specifically, the

complaint alleges that the false statement made by JPMC's executives caused Citadel to withdraw from the trade agreed upon earlier in the day and that losing the proposed trade with Citadel caused the Fund more than $1 billion in losses. Accordingly, we would reinstate the Fund's tortious interference claim against JPMC.

However, we find that the motion court correctly found no sufficient business relationship between Advisors and JPMC so as to support a claim for tortious interference (the fourth cause of action). Advisors relies on *TVT Records v Island Def Jam Music Group* (279 F Supp 2d 366 [SD NY 2003], *revd on other grounds* 412 F3d 82 [2d Cir 2005]) for the proposition that Advisors had a sufficient business relationship to allege tortious interference because it would have received a share of the benefit of the Fund's transactions. (*Id.* at 383-384.) However, Advisors disregards the fact that in *TVT Records*, the plaintiff was a wholly-owned subsidiary of a company whose copyrights were infringed. (*Id.*) In the instant case, even assuming that Advisors received substantially all of its revenue from the Fund, the two are nevertheless legally separate entities.

More on point is the holding in *Kirch v Liberty Media Corp.* (449 F3d 388 [2d Cir 2006].) In *Kirch*, the plaintiff's sole purpose was to act as the exclusive American agent of a foreign corporation which was defamed. The court distinguished that case from *TVT Records*, observing that although a wholly-owned subsidiary may be directly impacted by harm to its parent company, the harm suffered by an exclusive agent was merely derivative, and therefore too attenuated to support a cause of action for tortious interference. (*Kirch*, 449 F3d at 400-401.) Lacking an ownership relationship with the Fund, the most Advisors can claim is to be its exclusive agent. Therefore, we find that Advisors failed to plead a sufficient business relationship to support a tortious interference claim.

We have considered the parties' remaining contentions for affirmative relief and find them unavailing.

Accordingly, the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered November 10, 2008, which, to the extent appealed from as limited by the briefs, denied defendant JPMFI's motion to dismiss the first cause of action and granted defendants' motion to dismiss the second, fourth and fifth causes of action, should be modified, on the law,

to grant JPMFI's motion with respect to the first cause of action for breach of contract, and to deny defendants' motion with respect to the second cause of action, and otherwise affirmed, without costs.

GONZALEZ, P.J., TOM, SWEENY and RENWICK, JJ., concur.

Order, Supreme Court, New York County, entered November 10, 2008, modified, on the law, to grant defendants' motion with respect to the first cause of action for breach of contract, and to deny defendant J.P. Morgan Futures, Inc.'s motion with respect to the second cause of action, and otherwise affirmed, without costs.