**HANNEX CORPORATION,**
Plaintiff–Appellant,

v.

**GMI, INC.; G.M.I. Photographic Inc.; Robert Brockway; Joe Gallen and Sea & Sea Products Ltd, a Japanese Corporation, Defendants–Appellees.**

Docket No. 96–9521.

United States Court of Appeals,
Second Circuit.

Argued Aug. 4, 1997.

Decided March 25, 1998.

Michael H. Smith, New York City (Ronald J. Offenkrantz, Spitzer & Feldman, P.C., New York City, of counsel), for Plaintiff–Appellant.

Edward T. Dangel, III and Alexander T. Bok, Boston, MA (Susan N. Granoff, Dangel, Donlan and Fine, LLP, Boston, MA, of counsel), for Defendants–Appellees.

Before: CALABRESI, CABRANES and PARKER, Circuit Judges.

PARKER, Circuit Judge:

Plaintiff–Appellant Hannex Corporation ("Hannex") is a nonoperating Florida corporation whose sole business was the distribution of underwater photographic equipment manufactured by Defendant–Appellee Sea & Sea Products Ltd., a Japanese corporation ("S & S Japan"). Hannex asserts two causes of action. First, Hannex alleges that Defendants–Appellees GMI Inc.[1], G.M.I. Photographic Inc., a Delaware corporation ("GMI"), Robert Brockway, GMI's Chairman ("Brockway"), Joe Gallen, GMI's President ("Gallen") and S & S Japan (collectively "Defendants") tortiously interfered with the fiduciary duties owed to Hannex by its former employee, Lawrence Salvo ("Salvo"). Hannex alleges that Salvo breached those duties by actively soliciting the business of its former supplier, S & S Japan, on behalf of a competitor, GMI. Second, Hannex alleges that GMI, Brockway, and Gallen tortiously interfered with contractual and prospective business relations, including a prospective distribution agreement Hannex was negotiating with S & S Japan.

The United States District Court for the Eastern District of New York (Nicholas Tsoucalas, Judge)[2] granted Defendants' motion for judgment as a matter of law pursuant to Rule 50(a) on both of Hannex's causes of action at the conclusion of the presentation of evidence concerning liability at trial before a jury, and prior to closing arguments and a jury verdict. Hannex argues that it established a sufficient factual basis at trial from which a reasonable jury could find for it on both causes of action, and that the district court therefore improperly granted Defendants' Rule 50(a) motion.

We affirm in part, vacate in part, and remand.

## I. BACKGROUND

### A. Factual background[3]

#### 1. Jack Hannes's Business Dealings with S & S Japan

In 1980, S & S Japan began to distribute its products in the United States through Hanimex USA, Inc. ("Hanimex USA") pursuant to unwritten agreements, prior to which S & S Japan had terminated a series of prior distributors for failing to obtain adequate financing. Hanimex USA was a subsidiary of Hanimex, Inc., an Australian corporation ("Hanimex"). At the time, Hanimex was a large publicly traded company whose business was the manufacture and worldwide distribution of camera equipment. Jack Hannes, now the chairman of Hannex, founded Hanimex in 1947, and was its chief executive officer until 1982.

S & S Japan distributed two underwater cameras, a 110mm and a 35mm, through

---

1. The record shows that GMI, Inc. does not presently exist, nor ever did. Accordingly, the balance of this opinion only discusses the other defendants.

2. Senior Judge, United States Court of International Trade, sitting by designation.

3. The following recitation of the relevant facts consists of undisputed facts, as well as certain facts in dispute which serve to support Hannex's claim. It is appropriate to include these disputed facts here as we are reviewing the grant of judgment as a matter of law, and must construe all facts in the light most favorable to Hannex. See Pan Am. World Airways, Inc. v. Port Auth., 995 F.2d 5, 8 (2d Cir.1993).

Hanimex. The design, manufacture and distribution of these cameras were in part the result of collaborative efforts and agreements between S & S Japan and Hanimex, which in turn were the product of meetings between S & S Japan's chief executive officer, Masaoki Yamaguchi ("Yamaguchi"), and Jack Hannes. Hanimex committed to purchase and distribute a specific number of each camera, and also provided engineering assistance in the design of the 35mm camera. Through these arrangements, Hanimex became the primary worldwide distributor of the 35mm camera. However, S & S Japan also distributed the 35mm camera in the United States through an independent dive shop.

In 1985, S & S Japan terminated the distributorship with the dive shop for failure to obtain adequate financing. S & S Japan then entered into a distribution agreement, dated June 13, 1985, with a new company formed by Salvo, Al Bernard ("Bernard") and Bayard Moffit ("Moffit"), named Sea & Sea USA, Inc. ("S & S USA") (the "1985 Agreement"). Bernard, who had formerly worked with Jack Hannes at Hanimex, had introduced Salvo to Yamaguchi in early 1985. Salvo and Bernard assured Yamaguchi that they would be able to secure adequate financing for the venture through a line of credit available to Moffit. The 1985 Agreement granted S & S USA the "exclusive" right to sell and distribute S & S Japan's products in the United States, but explicitly provided that S & S Japan could continue to distribute its products in the United States through Hanimex. The 1985 Agreement was assignable by either party with the consent of the other, which consent could not be unreasonably withheld.

S & S USA had no employees. Salvo's small photographic manufacturing and supply company, Graflex Sub–Sea Corporation ("Graflex Sub–Sea"), handled the distribution of the imported cameras. In early 1986, soon after S & S USA began importing the cameras, it became evident to Yamaguchi that S & S USA could not obtain the financing necessary to be an effective distributor.

Bernard approached Jack Hannes in an effort to secure additional financing. Jack Hannes agreed to invest $50,000 in S & S USA.

Despite this investment from Jack Hannes, S & S USA continued to experience problems funding the purchase of products from S & S Japan. Yamaguchi threatened to terminate the distributorship unless S & S USA could obtain additional financing. Bernard then approached Jack Hannes again seeking additional financing. In communications with Bernard and Yamaguchi, Jack Hannes stated that he would provide additional financing, but only to a new company which would be under joint control and free of S & S USA's and Graflex Sub–Sea's debts. Between September 1986 and early 1987, Jack Hannes communicated several times with Salvo, Moffit, Bernard, and Yamaguchi concerning a proposal to form a new company that would, in conjunction with S & S USA and Graflex Sub–Sea, import and distribute S & S Japan's products under the 1985 Agreement. Having obtained the general agreement of Moffit, Salvo and Bernard to such an arrangement, Jack Hannes proceeded to establish letters of credit through his Australian holding company, Hanset Proprietary, Ltd. ("Hanset") for the benefit of S & S USA. Under this arrangement, Hanset would provide financing and collect receivables, while Graflex Sub–Sea and S & S USA were responsible for operation, sales, marketing, and administration of the distribution business.[4]

In January 1987, at a Las Vegas trade show, Jack Hannes informed Yamaguchi of the new arrangement, stating that a new company would be formed as soon as possible which would "act solely as distributors for [S & S Japan's] product." He also told Yamaguchi that Moffit, Salvo and Bernard would be given the opportunity to obtain equity in the new company. According to Jack Hannes, after this discussion, Yamaguchi introduced him to S & S Japan's international distributors as S & S Japan's "distributor for the United States."

---

4. It is unclear from the record whether or not Hanimex USA would continue to distribute S & S Japan's products independently.

On June 17, 1987, Jack Hannes entered into an agreement with Moffit, Salvo and Bernard formalizing the new arrangement. Jack Hannes agreed to provide letters of credit on behalf of S & S USA until a new company, Hannex, could be established. On behalf of S & S USA, Moffit, Salvo and Bernard agreed to assign "all product lines, agencies, and other rights, and . . . use their best efforts to maintain these product lines, rights, and agencies, in particular, the agency with [S & S Japan]." The parties agreed that the distribution would be handled through Graflex International Corporation ("Graflex"), formerly known as Graflex Sub–Sea, of which Salvo, Moffit and Bernard were shareholders, and of which Salvo was president. This arrangement was to last at least two years. In return, Graflex received shares in Hannex. Moffit, Salvo and Bernard received options to buy shares in Hannex. The agreement provided that until Hannex became fully operational, the existing arrangement between Hanset, Graflex, and S & S USA would continue.

Jack Hannes incorporated the new company, Hannex, on June 18, 1987, and on July 28, 1987, the parties executed a new agreement largely restating the terms of the June 17 agreement. Subsequently, S & S USA was merged into Graflex, leaving Graflex as the surviving corporation, and Jack Hannes incorporated a new corporation with the name Sea & Sea USA ("New S & S USA") as a wholly-owned subsidiary of Hannex. This was done primarily to allow the Hanneses to continue using the name "Sea & Sea USA" in the distribution of S & S Japan's products. Finally, on April 1, 1988, Salvo executed a covenant not to compete with Hannex.

After formally reorganizing the distribution arrangement in the United States, Jack Hannes and his son, Martin, met with Yamaguchi in Japan to discuss the situation. The Hanneses and Yamaguchi discussed the existing United States distribution business and the structure of the new organization, as well as the prospect of extending distribution into Central America and the Caribbean. Specifically, the Hanneses told Yamaguchi that a new company, Hannex, had been formed, and that it would be able to secure adequate financing, free of the debts of the companies Yamaguchi had previously been dealing with. Finally, they also discussed with Yamaguchi the possibility of obtaining accreditation from the Japanese Ministry of Trade and Industry for Hannex, which accreditation would allow S & S Japan to obtain export insurance for shipments to Hannex.

2. *Hannex's Attempts to Obtain S & S Japan's Consent to the Assignment*

After S & S USA agreed to assign its distribution rights under the 1985 Agreement to Hannex in the June and July 1987 agreements, the Hanneses endeavored to obtain S & S Japan's written consent to the assignment as required by the 1985 Agreement. To this end, Salvo agreed to contact Yamaguchi. Salvo and Bernard each sent telefaxes to Yamaguchi confirming that Jack Hannes had joined the United States organization as a major shareholder, and requesting that Yamaguchi enter into a new distribution agreement naming "Hanset Pty, Ltd. and/or its subsidiary Sea & Sea USA" as exclusive distributors. In the meantime, Hannex continued to carry on the distribution business under the arrangement discussed above and pursuant to the 1985 Agreement.

After receiving the telefaxes from Salvo and Bernard, and after further inquiries from the Hanneses about amending the 1985 Agreement or entering into a new agreement, Yamaguchi instructed his lawyers to review the 1985 Agreement. Yamaguchi asked Martin Hannes to bring him "up to date" as to the relationship between Hanset and S & S USA and whether it would be "virtually Hanset who will represent us in USA Mainland." In response, Martin Hannes called Yamaguchi and explained to him that Hannex would be the distributor and "Sea & Sea USA" was set up to be Hannex's trading division. He also agreed with Yamaguchi to have Hannex pay the debts owed by S & S USA to S & S Japan.

The Hanneses believed, in light of their discussions and course of dealing with Yamaguchi, that Yamaguchi understood that the "Sea & Sea USA" referred to in the proposed distribution agreement was New S

& S USA, Hannex's subsidiary. However, there was some miscommunication. The Japanese Commercial Arbitration Association ("JCAA"), to which the district court referred certain of Hannex's claims pursuant to the 1985 Agreement, found that Yamaguchi did not share the Hanneses' understanding. This finding is binding on the parties for the purposes of this appeal.[5]

Throughout the negotiations between Yamaguchi and Martin Hannes concerning the new distribution agreement, Yamaguchi believed that the parties to the new agreement would be Hanset and Salvo's old company, S & S USA, who would act as co-distributors. The draft agreement sent by S & S Japan to Martin Hannes did not list S & S USA as a subsidiary of Hannex or Hanset; rather, it added Hanset to a preamble identical to the one in the 1985 Agreement. The supposedly final version of the agreement, to which Yamaguchi and the Hanneses agreed in principle in May 1988, but which was never executed, did not alter this, nor further illuminate the issue. The ambiguity is heightened by the fact that during the course of the negotiations, Yamaguchi objected to language providing that the agreement could be assigned without consent to any wholly owned subsidiary.

In July 1988, after the final version of the proposed distribution agreement had been agreed to by the Hanneses and Yamaguchi, but before it was executed, Yamaguchi learned for the first time that S & S USA was not a party to the agreement and, that, in fact, it no longer existed. Yamaguchi refused to sign the proposed agreement when he met with Jack Hannes in Australia, in late July 1988. Yamaguchi requested a written consent of S & S USA to the termination of the 1985 Agreement.

### 3. Salvo's Alleged Double Dealing

While these negotiations with Yamaguchi concerning the new distribution agreement proceeded, Hannex restructured the United States distribution operation. Salvo agreed to become Hannex's vice president of sales and marketing on April 1, 1988. He signed a letter agreement giving him an incentive bonus, terminating a management agreement between Hannex and Graflex, and reiterating a non-compete clause he had previously signed.

Hannex alleges that, around this time, Salvo surreptitiously began helping GMI, a competitor in the photographic equipment business, wrest S & S Japan's distribution business away from Hannex. GMI had been purchased by financiers in early 1988 and was looking for new product lines to enter. GMI pursued the idea of obtaining distribution rights in S & S Japan's products, and, to this end, offered to purchase Hannex. In May and June 1988, representatives of GMI communicated with Bernard concerning the terms of a possible deal. Jack Hannes initially expressed some interest in the proposals, but did not authorize anyone at Hannex to negotiate with GMI. After the July meeting with Yamaguchi in Australia, Jack Hannes told Gallen, the president of GMI, that he was not interested in discussing any proposed purchase of Hannex until October, at a trade show in Germany. Jack Hannes requested that GMI not meet with Yamaguchi in the meantime.

In response to Yamaguchi's request for a release from S & S USA at the July 1988 meeting in Australia, Martin Hannes faxed a proposed consent to Salvo and requested that

---

**5.** The factual findings of the JCAA are binding on the parties to the extent that they were necessary to the arbitration panel's rulings. *Cf. Wickham Contracting Co., Inc. v. Board of Educ.*, 715 F.2d 21, 28 (2d Cir.1983) (citing *RX Data Corp. v. Department of Soc. Servs.*, 684 F.2d 192, 197 (2d Cir.1982)). The arbitration panel ruled as follows: 1) Yamaguchi did not impliedly consent to an assignment of the 1985 Agreement to Hannex by dealing with the Hanneses' companies—Hanset, Hannex and New S & S USA—because Yamaguchi believed that S & S USA and/or Graflex were continuing to act and would continue to act as co-distributors; and 2) Hanset did not have a valid contract with Yamaguchi under the 1988 agreement because Yamaguchi thought that S & S USA was a party to the agreement whereas the Hanneses intended for New S & S USA to be a party. Where these findings contradict Hannex's evidence at trial—specifically, that Yamaguchi was aware that S & S USA was a party to the proposed agreement—the arbitrator's findings are preclusive. We therefore recount the facts consistent with the findings of the arbitration panel.

he sign it and fax it back to him. Approximately three days later, Salvo returned the executed consent to the Hanneses. In the interim, unbeknownst to the Hanneses, Salvo spoke to both Gallen and Yamaguchi. On the evening of July 28, Salvo spoke to Gallen by phone for sixteen minutes and spoke to Yamaguchi by phone at his hotel room in Australia for over thirty minutes. Salvo spoke to Yamaguchi again by phone on July 31, just before the Hanneses telefaxed the executed consent to Yamaguchi in Japan. When Yamaguchi received the consent, Yamaguchi told Martin Hannes that the document was incomplete because it was missing a line for his signature.

In response, the Hanneses instructed Salvo to prepare and execute a new release. Salvo did not provide the revised release to the Hanneses for another two weeks. In the interim, Salvo again met with and spoke to representatives of GMI several times, and planned to join Gallen on a trip to Japan to meet with Yamaguchi. The trip was to be paid for by GMI. Salvo deceived the Hanneses about the nature of the trip, telling Martin Hannes that he was using frequent flier miles to vacation in Japan. When Jack Hannes separately warned Salvo and Gallen that he opposed any meeting between them and Yamaguchi, Salvo cancelled the trip. Gallen went anyway, and met with Yamaguchi. Salvo also lied to Jack Hannes about the reasons for cancelling the trip, telling him that his frequent flier miles were not valid for the month of August.

During the period from April to October 1988, Salvo met with Gallen at least four times and met with Brockway four or five times. He also spoke with them on the phone numerous times. The Hanneses were not aware of and did not authorize any of these contacts. Salvo continued to meet secretly with GMI representatives, even after being told not to communicate with Gallen, and after Jack Hannes informed Gallen that he was not interested in selling Hannex. Salvo also consulted repeatedly with GMI's attorneys and his own attorney, at GMI's expense, concerning the validity of his non-compete agreement with Hannex. In connection with these consultations, Salvo sent GMI's attorneys a letter, attaching documents to demonstrate that the Hanneses were undermining his authority. He also sent to GMI and its attorneys internal Hannex documents indicating that the proposed 1988 distribution agreement had not been signed by Yamaguchi. Around this time, GMI also assured Yamaguchi that if GMI obtained S & S Japan's business, Salvo would be offered a job.

In late August 1988, after the meeting between Gallen and Yamaguchi in Japan, Yamaguchi agreed to fly to New York to meet with GMI. Prior to this meeting, and after learning that Bernard had left Hannex, Yamaguchi sent a telefax to Jack and Martin Hannes indicating, for the first time, his reluctance to sign the proposed distribution agreement. Yamaguchi stated that he needed to reevaluate the proposed agreement in light of the growing disharmony between the parties handling the distribution effort in the United States Before Bernard left Hannex, Yamaguchi had expressed his concern that Salvo and the Hanneses did not have a good working relationship. Yamaguchi also made it clear in the telefax that he wanted Salvo and Bernard involved in the United States distribution business. Yamaguchi further told the Hanneses in the telefax that he would be traveling in Europe until September. He did not, however, inform them of his plans to meet with GMI, Salvo and Bernard in New York.

Salvo and Bernard both attended the September meeting in New York between GMI and Yamaguchi. Salvo sent a note to Martin Hannes to conceal his whereabouts during this time, stating that he was attending a seminar in Tampa, Florida. On the day of the New York meeting, Jack Hannes telefaxed a letter to Salvo in Florida, for Salvo's signature, which urged Yamaguchi to sign the proposed distribution agreement. Salvo declined to sign it, telling Jack Hannes that he would prefer to speak to Yamaguchi directly. In response to Salvo's refusal to sign, Jack Hannes sent Salvo a strongly worded reply reminding him of his fiduciary duties, instructing him to use his best efforts to get Yamaguchi to sign the agreement, and telling him not to talk to GMI. Upon receipt of this

reply, Salvo faxed the document to Gallen. Gallen, in turn, faxed it to another GMI representative with the message "URGENT—Please show this to Paul Hartnett [GMI's attorney] at once. Are we in a position to advise Larry Salvo what to do? Please respond quickly."

Nine days after the September meeting in New York, GMI's attorneys sent Yamaguchi a draft of a proposed distribution agreement. The draft agreement provided that GMI would be appointed the exclusive distributor of S & S Japan's products in the United States The cover letter to the draft, which GMI's attorneys prepared, stated that any agreement would not be executed until an arrangement could be worked out with the Hanneses. It also stated, falsely, that such "discussions are proceeding." Hannex alleges that the letter was intended to be falsely exculpatory and therefore shows GMI's consciousness of wrongdoing.

In October 1988, at a trade show in Germany, Jack Hannes met with Gallen and Brockway for the first time. They offered to buy Hannex from him, but the parties were far apart on price. According to Jack Hannes, the negotiations ceased, partly because he did not like GMI's offer and partly because Brockway told him that he knew Hannex did not have a contract with S & S Japan. When Brockway informed Jack Hannes that he knew Hannex had no contract with S & S Japan, Jack Hannes abruptly told him to leave.

Soon after, after discovering that Salvo was conducting business without his authorization, Jack Hannes fired Salvo. The Hanneses informed Yamaguchi of the firing immediately. When Gallen found out about the firing from Salvo, he sent a telefax to Yamaguchi. Gallen told Yamaguchi that the Hanneses had attacked Salvo when he tried to leave Hannex's Florida office with personal belongings, and that Jack Hannes had cancelled the non-competition agreement by firing Salvo. Gallen also stated that now "Maybe [S & S Japan], Larry Salvo, and GMI can move quickly to organize new and strong sales efforts in USA."

After receipt of Gallen's telefax, Yamaguchi agreed to terminate the Hannex distribu-

torship and to sign an agreement granting GMI exclusive distribution rights. Yamaguchi insisted, however, that GMI agree to indemnify him for any suit brought by the Hanneses. In demanding the indemnification clause, Yamaguchi pointed out that although Jack Hannes did not have a contract with S & S Japan, "[t]he fact is he has invested nearly $400,000 in this business.... What would you do if you would have spent this much money and done business without major hitch, yet been told 'no more supplies' when we can see no major errors on your part?"

In response to this turn of events, Hannex sued Salvo in Florida state court, seeking a preliminary injunction to prevent Salvo from working for GMI. Salvo was represented by GMI's attorneys in this suit. The state court denied the motion for a preliminary injunction.

### B. *Procedural Background*

#### 1. *Motions to Dismiss and for Summary Judgment*

On January 20, 1989, Hannex brought this suit in the Eastern District of New York, with jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332(a), naming GMI, Gallen, Brockway, and S & S Japan as defendants, asserting five causes of action, and again seeking equitable relief. The first cause of action asserted that each of the Defendants tortiously interfered with Salvo's fiduciary duties to Hannex. The second cause of action alleged that GMI, Gallen and Brockway tortiously interfered with Hannex's contractual and prospective business relations with S & S Japan. The other causes of action were for injunctive relief, for breach of contract against S & S Japan and for antitrust violations.

The district court (Charles Sifton, *Chief Judge*), in a memorandum and order, dated June 15, 1989, denied the motion for the preliminary injunction, and dismissed the contract action against S & S Japan, referring them to arbitration before the JCAA pursuant to the arbitration clause in the 1985 Agreement. The district court also dismissed Hannex's antitrust claim. Subse-

quently on a motion for summary judgment by Defendants, the district court, in a memorandum and order, dated December 1991, stayed the action pending arbitration before the JCAA. In this order, the district court also denied Defendants' motion for summary judgment on the tortious interference with contractual and prospective business relations claim, reasoning that that claim depended upon the results of the arbitration.[6] The order also denied Defendants' motion for summary judgment on the tortious interference with fiduciary duty claim, because that claim did not depend upon the existence of a contractual relationship between Hannex and S & S Japan. The court reasoned that:

> When viewed in the light most favorable to [Hannex], the evidence presented could lead a jury to conclude that Salvo breached a contractually based fiduciary duty of loyalty by helping S & S Japan and GMI to enter into an arrangement that decimated Hannex'[s] business and that S & S Japan and GMI brought about or participated in this conduct.

The district court specifically pointed to the circumstantial evidence supporting this claim, which included:

> Meetings between Salvo and the alleged co-conspirators with the purpose of shifting S & S Japan's business from Hannex to GMI, Salvo's lying to Hannex about those meetings, GMI's payment of money to Salvo for expenses incurred while he was still on Hannex'[s] payroll, an apparent agreement between S & S Japan and GMI that GMI would hire Salvo, and Salvo's sending of internal Hannex correspondence to GMI. . . .

Following the JCAA ruling, Defendants moved again for summary judgment. They argued that the JCAA's ruling precluded Hannex's tortious interference with existing and prospective business relations claim. The district court, (Sterling Johnson, Jr., *Judge*), again denied the motion in a brief

order. Accordingly, a trial was necessary to resolve Hannex's first two causes of action.

### 2. The Trial and the Judgment as a Matter of Law

A jury trial on Hannex's first two causes of action was held from September 30 to October 4, 1996, with Judge Nicholas Tsoucalas presiding. At the close of the presentation of all evidence on liability, but prior to presentation of evidence concerning damages, closing arguments or a jury verdict, the Defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The district court granted this motion. In granting Defendants judgment on the first cause of action, the court reasoned, somewhat unclearly, that the evidence did not support an inference that Defendants participated in any breach of fiduciary duty by Salvo. With regard to the second cause of action, the district court ruled that "there is no evidence whatsoever" to support Hannex's allegation that GMI, Gallen and Brockway interfered with Hannex's prospective contractual relations with S & S Japan. The court reasoned that where certain conduct advances a competitor's independent business interest, any interference is not actionable unless "the means employed included or include criminal or fraudulent conduct." The court found that no such conduct took place in this case. Further, the court found that Yamaguchi terminated Hannex because he was dissatisfied. Accordingly, the district court granted judgment to Defendants on the tortious interference with contractual and prospective business relations claim as well.

This appeal followed.

## II. DISCUSSION

For the reasons that follow, we agree with Hannex that the district court improperly granted judgment as a matter of law to defendants GMI, Gallen and Brockway on

---

6. The district court unnecessarily granted summary judgment to S & S Japan on Hannex's tortious interference with contract claim, reasoning that a party to a contract cannot tortiously interfere with it. This ruling is erroneous, as S & S Japan was not named in that cause of action. The district court addressed the tortious interference with contract claim as the first cause of action, when, in fact, it was the second cause of action. The second cause of action names only GMI, Gallen and Brockway as defendants. This error is obviously, however, of no import to our decision here.

Hannex's first and second causes of action. A reasonable jury could conclude, based on the evidence presented by Hannex regarding the nature of the dealings between these Defendants and Salvo, that these Defendants participated in a knowing breach of Salvo's fiduciary duties. A reasonable jury could also conclude that Hannex lost a valuable business opportunity as a result of this breach, including the loss of a prospective contractual relationship between Hannex's subsidiary and S & S Japan. We agree with the district court, however, that Hannex presented insufficient evidence to support a judgment against S & S Japan for tortious interference with fiduciary duties.

Thus, we vacate those portions of the judgment granting GMI, Gallen and Brockway judgment as a matter of law on Hannex's first and second causes of action, and remand this case to the district court for proceedings consistent herewith, and we affirm that portion of the judgment granting S & S Japan judgment as a matter of law on Hannex's first cause of action.

A. *Standard for Granting Judgment as a Matter of Law*

▇▇▇ A court may not properly grant judgment as a matter of law "unless, viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'" *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970)). In ruling on a motion for judgment as a matter of law, a court "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." *Id.* at 16. Judgment as a matter of law is improper unless, properly viewed, " 'the evidence points so strongly in favor of one party that a reasonable jury could reach but one conclusion, in favor of

that party.' " *Pan Am. World Airways, Inc. v. Port Auth.*, 995 F.2d 5, 8 (2d Cir.1993) (quoting *Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir.1991)). We review the evidence in light of this well-established standard.

B. *First Cause of Action: Tortious Interference with Salvo's Fiduciary Duties*

▇▇▇ Under New York law,[7] a tortious interference with fiduciary duty claim consists of three elements: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach." *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847–48 (2d Cir.1987)(applying New York law) (citations omitted). With regard to the first element of this claim, the parties agree that an agent of a corporation owes fiduciary duties to his principal, the corporation, and he breaches those duties when he fails to act in the best interest of the corporation. The second element of this claim does not require proof of wrongful intent; knowing participation in such a breach is sufficient. *See S & K Sales*, 816 F.2d at 848–49. The third element of the claim is clear on its face, and is satisfied upon a showing of pecuniary harm. *See Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1117 (2d Cir.1986). Applying these principles to Defendants GMI, Gallen and Brockway, we find that the evidence before the district court was sufficient to support a finding in favor of Hannex.

First, there is sufficient evidence to support Hannex's allegation that Salvo breached his fiduciary duty to Hannex, his employer. Salvo met repeatedly with GMI without informing the Hanneses, even after being told by Jack Hannes not to meet with GMI. Salvo participated in meetings between GMI and Yamaguchi, meetings that Jack Hannes specifically instructed Salvo not to arrange or participate in. Salvo repeatedly told falsehoods to Jack and Martin Hannes to conceal his frequent contacts with GMI. Salvo arranged to attend a meeting with GMI and

---

7. The parties seem to agree, as both argue New York law in their briefs, that New York law, the law of the forum state, governs Hannex's claims. As such, New York law is properly applied to

these claims. *See Tehran–Berkeley Civil and Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989).

Yamaguchi in Japan, without the consent of the Hanneses and contrary to Martin Hannes's express instructions. Moreover, Salvo failed to carry out Jack Hannes's instruction to urge Yamaguchi to sign a proposed distribution agreement. When Jack Hannes reprimanded Salvo for these actions, Salvo forwarded the letter to GMI and its attorneys and asked them how to proceed. Furthermore, the evidence suggested, and the jury could find, that all of these things were done to assist GMI in entering into an arrangement which would be devastating to Hannex, Salvo's employer, to which he owed a fiduciary duty. A reasonable jury could conclude, based on this evidence, that Salvo breached his fiduciary duty by refusing to use his best efforts to obtain a new distribution agreement that would have benefitted Hannex and by purposefully trying to strike a deal with GMI and S & S Japan that was contrary to Hannex's financial interest.

There is also sufficient evidence to support Hannex's allegation that GMI, Gallen and Brockway knowingly participated in this breach. After being put on notice that Jack Hannes disapproved of any meetings between them and Yamaguchi, and that he disapproved of Salvo contacting GMI, they continued to meet with Salvo in the effort to acquire either the Hannex business or a distribution agreement with S & S Japan. While Salvo was still employed by Hannex, GMI paid Salvo's expenses in attending meetings and making calls on behalf of GMI, and booked Salvo's plane tickets through GMI's travel agent. Salvo provided sensitive Hannex information to GMI. Salvo informed GMI that Hannex did not have an existing contractual relationship with S & S Japan at the very time Salvo was supposed to be trying to finalize the contract. He also consulted GMI and its attorneys about his non-compete agreement while still employed by Hannex. This unusual course of dealings is circumstantial evidence sufficient to support the inference that GMI, Brockway and Gallen knowingly participated in Salvo's breach.

Finally, a jury could conclude that Hannex suffered damages as a result. Yamaguchi initially indicated that he would sign the distribution agreement, and that he was satisfied with Hannex's distribution effort. However, after Salvo began his string of contacts with GMI, Yamaguchi changed his mind. There is evidence suggesting that Yamaguchi insisted on including Salvo in any future distribution arrangement, thus making Salvo's loyalty to Hannex critical to maintaining the relationship between Hannex and S & S Japan. A jury could conclude, therefore, that had Salvo not worked secretly with GMI, S & S Japan would have continued to do business with the Hanneses' companies in the United States. In any event, Hannex was precluded from presenting evidence of damages because of the bifurcated nature of the trial and the lower court's ruling. Such proof may be presented upon re-trial of the case.[8]

With respect to Defendant S & S Japan, however, we agree with the district court that the evidence was insufficient to support a judgment in Hannex's favor. Although there is some evidence to suggest that Yamaguchi was aware that Salvo had a relationship with Hannex, there is not sufficient evidence from which a reasonable trier of fact could infer that Yamaguchi knew this relationship was of a fiduciary nature.

The JCAA found, and these findings are binding on the parties for purposes of this appeal, *see supra* n. 5, that Yamaguchi believed New S & S USA was in fact S & S USA, that S & S USA was still a party to the distribution agreement, that it was acting as a co-distributor with Hannex, and that it would be a party to the new distribution agreement. While as a result of this understanding Yamaguchi would clearly expect there to be some contractual relationship between Salvo and Hannex, he understood Salvo to represent a distinct corporate entity (S & S USA, not Hannex-owned New S & S USA). To assume that Yamaguchi understood there to be a fiduciary, rather that contractual, relationship between Salvo and Hannex would be entirely speculative. Ac-

---

**8.** Inasmuch as Hannex must prove that it suffered damages as a result of Salvo's alleged breach of fiduciary duty in order to make out the

third element of this claim against GMI, *see S & K Sales,* 816 F.2d at 847–48, the district court should not bifurcate the new trial on remand.

cordingly, this portion of the claim was properly dismissed.

### C. Second Cause of Action: Tortious Interference with Contractual and Prospective Business Relations

#### 1. Hannex's Prospective Business Relationship

Defendants GMI, Gallen and Brockway, against whom Hannex's second cause of action is directed, argue that because Hannex was not to be a party to the proposed 1988 distribution agreement, Hannex cannot claim that they tortiously interfered with Hannex's contractual and prospective relations with S & S Japan. We disagree.

First, we agree with Hannex that this claim was properly before the district court. The pretrial order defined the issues to be tried as including S & S Japan's failure to assign the 1985 Agreement and Yamaguchi's failure to sign the 1988 distribution agreement, due to the GMI Defendants' interference. While Hannex's claim that the GMI Defendants interfered with Hannex's existing contractual rights fails, in light of the JCAA's decision that Hannex had no contractual rights, this ruling does not preclude Hannex's claim based on its prospective business relations with S & S Japan.

■■■ To state a claim for tortious interference with prospective business relations, a valid contract is not necessary. *See NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 621, 664 N.E.2d 492, 496, 641 N.Y.S.2d 581, 585 (1996); *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 190–91, 406 N.E.2d 445, 448–49, 428 N.Y.S.2d 628, 632–33 (1980). Further, it is not necessary for Hannex to prove that it would have been a party to any future contract with S & S Japan. Rather, it is well-settled that a plaintiff can recover if that plaintiff can prove that the defendant tortiously interfered with "a continuing business or other customary relationship not amounting to a formal contract." Restatement (Second) of Torts § 766B cmt. c (1979); *see also PPX Enters., Inc. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 270 (2d Cir.1987). According to the Restatement, to

which the New York Court of Appeals has generally looked in defining the scope of the cause of action, *see Guard–Life,* 50 N.Y.2d at 190–92, 406 N.E.2d at 448–49, 428 N.Y.S.2d at 632–33, "[i]t is not necessary that the prospective relation be expected to be reduced to a formal, binding contract." Restatement (Second) of Torts § 766B cmt. c. Accordingly, the tort encompasses the kind of conduct alleged here, including "interferences with ... the opportunity of selling or buying ... chattels or services, and any other relations leading to potentially profitable contracts." *Id.*

Here, although Hannex did not have a contract with S & S Japan, Hannex controlled the distribution of S & S Japan's products in the United States through Hannex's other contractual relationships. Further, although Hannex did not have a formal contract with S & S Japan, Jack Hannes testified that S & S Japan dealt with Hannex as a co-distributor in the United States. In many countries, Yamaguchi dealt with distributors without written contracts. Regardless of whether or not Hannex would have been a party to any future contract, Hannex lost a valuable business relationship when S & S Japan signed the exclusive distribution agreement with GMI.

Moreover, a jury could conclude that Hannex would have directly benefited under the proposed distribution agreement. Although Yamaguchi at first misunderstood who was to be a party to the distribution agreement, once he knew that New S & S USA, Hannex's subsidiary, was to be a party—rather than Salvo's former company, S & S USA— Yamaguchi instructed Jack Hannes to obtain a release from Salvo. According to Martin Hannes, New S & S USA was incorporated as the wholly owned subsidiary of Hannex to allow Hannex to continue using the S & S USA name in distributing S & S Japan's products in the United States. Martin Hannes explained the nature of this relationship to Yamaguchi, and Hannex would have directly benefited under the contract, through New S & S USA. Accordingly, the second cause of action cannot be dismissed simply because Hannex was not named in the proposed agreement.

### 2. *Wrongful Means*

■ The district court dismissed Hannex's second cause of action because it determined that Hannex introduced insufficient proof that Defendants engaged in "criminal or fraudulent conduct." We believe that Hannex adduced sufficient evidence to prove fraudulent conduct.

■ To state a claim for interference with contractual and prospective business relations against a competitor, the alleged tortfeasor must employ "wrongful means." *See NBT Bancorp,* 87 N.Y.2d at 624, 664 N.E.2d at 497, 641 N.Y.S.2d at 586; *Guard–Life,* 50 N.Y.2d at 190–91, 406 N.E.2d at 448–49, 428 N.Y.S.2d at 632; *PPX,* 818 F.2d at 269; *see also Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.,* 614 F.2d 832, 838 (2d Cir.1980). The definition of wrongful means under New York law includes "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *Guard–Life,* 50 N.Y.2d at 191, 406 N.E.2d at 449, 428 N.Y.S.2d at 632; *see also NBT Bancorp,* 87 N.Y.2d at 624, 664 N.E.2d at 497–98, 641 N.Y.S.2d at 586–87 (quoting definition in *Guard–Life* ). In *PPX,* we noted in dicta that under New York law "[i]f the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct." 818 F.2d at 269 (citations omitted).[9]

■ As we outlined above, Hannex adduced sufficient proof for a jury to conclude that Salvo knowingly breached his fiduciary duty and that GMI, Gallen and Brockway knowingly participated in the breach. A knowing breach of fiduciary duty may also, if it satisfies the usual common law elements, amount to a fraud or misrepresentation. *See Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.,* 45 N.Y.2d 692, 698, 385 N.E.2d 285, 288, 412 N.Y.S.2d 593, 596–97 (1978) (stating that under New York law, where a fiduciary relationship exists between parties, the law of constructive fraud applies); *see also Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 275–76 (2d Cir.1992) (noting that breach of a fiduciary duty may constitute a fraud in the context of ERISA); *United States v. Chestman,* 947 F.2d 551, 571 (2d Cir.1991) (holding that a knowing breach of fiduciary duty may constitute a fraudulent scheme for purposes of the federal mail fraud statutes). Therefore, in this case, if a jury were to find the Defendants tortiously interfered with Salvo's fiduciary duties to Hannex, they could also find that such interference constituted wrongful means sufficient to support a tortious interference with contractual and prospective business relations claim.

Briefly, the circumstantial evidence adduced to support the tortious interference with fiduciary duty claim, viewed in the light most favorable to Hannex, arguably showed that the GMI Defendants actively participated in the alleged breach, in that they were on notice that Salvo was not supposed to meet with them and that Hannex did not want them talking to Yamaguchi, and they received numerous Hannex documents from Salvo. Furthermore, a jury could conclude that both Hannex and arguably S & S Japan were actively misled about Salvo's role in this. Defendants' use of the information provided by Salvo was critical to Defendants' ability to wrest prospective business relations from Hannex, and afford them to GMI. Accordingly, based on this same evidence, a reasonable jury could find that Defendants' conduct was sufficient to support the tortious interference with contractual and prospective business relations claim. Therefore, it was error to dismiss the second cause of action.

## III. CONCLUSION

For the foregoing reasons, the judgment below is affirmed in part, vacated in part,

---

9. This language, limiting wrongful means to the categories of "criminal or fraudulent conduct," would appear unduly narrow, inasmuch as the New York Court of Appeals subsequently reiterated the *Guard–Life* standard (which encompasses a considerably wider range of conduct) in *NBT Bancorp,* 87 N.Y.2d at 624, 664 N.E.2d at 497– 98, 641 N.Y.S.2d at 586–87. While the Defendants' conduct could well satisfy even the narrow *PPX* standard, as explained below, that apparently incorrect characterization of New York law is not binding upon us because of the *intervening* NBT Bancorp decision.

and remanded for further proceedings consistent with this opinion.