TRI–COUNTY MOTORS,
INC., Plaintiff,

v.

AMERICAN SUZUKI MOTOR
CORPORATION,
Defendant.

No. 04–cv–0835–ENV–KAM.

United States District Court,
E.D. New York.

July 3, 2007.

Jeffrey R. Miller, Jeffrey Miller, P.C., New York, NY, for Plaintiff.

Carla W. McMillian, Sutherland, Asbill & Brennan, LLP, Atlanta, GA, Michael J. Levin, Barger & Wolen, LLP, New York, NY, for Defendant.

## DECISION AND ORDER

VITALIANO, District Judge.

Plaintiff Tri–County Motors, Inc. ("Tri–County") brings this action against defendant American Suzuki Motor Corporation ("ASMC") alleging breach of contract and promissory estoppel, tortious interference with contractual relations, and violation of the New York State Franchised Motor Vehicle Dealer Act all in connection with a failed attempt on the part of TriCounty to obtain a Suzuki franchise. ASMC now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56, which will be considered together with the earlier motion of Tri–County for an order striking ASMC's answer or, alternatively, imposing sanctions against ASMC for alleged discovery abuses, including spoliation of evidence. For the reasons set forth below, ASMC's motion is granted and Tri–County's is denied.

## I. Factual Background[1]

Vladimir Zanan ("Zanan") and Lester Wu ("Wu") are the principals of Tri–County, an entity formed in June 2003 for the purpose of engaging in the sale of new and used automobiles. On July 28, 2003, Tri–County entered into an asset purchase agreement ("purchase agreement") with Five Towns Suzuki, Inc. ("Five Towns Suzuki"), an already-existing ASMC Suzuki franchise located in Lawrence, New York, agreeing to pay Five Towns Suzuki $625,000 for certain of its assets, including $615,000 for the goodwill value of its business.[2] The purchase agreement also contained the following contingency clause: "The entire transaction provided for in this Agreement is subject to, conditioned and contingent upon the consent of Suzuki to the transaction contemplated herein and upon [Tri–County] being approved by Suzuki [as a franchisee]...." Def.'s Rule 56.1 Stmt. ¶¶ 6, 7; Borromeo Decl., Ex. 1.

The purchase agreement was thereafter forwarded for review to Christopher Borromeo ("Borromeo"), ASMC's Eastern Regional Dealer Network Manager and Assistant Regional Sales Manager, at ASMC's Regional Office in Mechanicsburg, Pennsylvania. On July 31, 2003, Borromeo sent Tri–County's counsel "[d]ealer [a]pplications and worksheet documents" to be completed and submitted by Tri–County's principals. In an attached cover letter, Borromeo explained that completion of the application package was "necessary to evaluate your clients' ability, automotive expertise in new vehicle sales and service, integrity, character, experience, reputation and other personal qualifications necessary for the performance of the Suzuki Sales and Service Agreement" as well as to ensure that "your clients' operational proposal ... is consistent with Suzuki's policies and procedures regarding facilities, capital and management." Borromeo also noted that, pursuant to a recently-enacted ASMC "retail initiative" known as "Suzuki Square," dealers were required "to con-

---

1. Unless otherwise indicated, the facts recited in this section and relied upon by the Court are undisputed.

2. However, pursuant to a modification agreement simultaneously executed, this price was to be reduced to $285,000 in the event that Tri–County and Five Towns Suzuki ultimately failed to enter into a lease arrangement for an existing off-premises parts and service facility operated by Five Towns Suzuki. *See generally* McMillian Decl., Ex. 11, § 1.

form to an established retail exterior and interior retail image." Consequently, "any new proposal requires an exclusive Suzuki facility." Borromeo concluded by stating that although "final approval/disapproval [of the dealer applications] will be at the sole discretion of [ASMC's] Executive Management in Brea, California," "no dealer candidate will be unreasonably denied." Def.'s Rule 56.1 Stmt. ¶¶ 4, 5; Borromeo Decl., Ex. 3.

As requested, Zanan and Wu completed their respective ASMC dealer applications. Each provided information regarding, *inter alia*, their education, work experience, and financial status. The applications, which were signed by Zanan and Wu on September 8, 2003, also included the following language:

1. The receipt by ASMC of this application does not obligate ASMC in any way to enter into [a dealership agreement].

2. No act other than the formal execution of [an agreement] by an officer of ASMC shall constitute approval of the application [by] ASMC, and any action taken, any expenditures made, or commitments assumed by [Tri–County] prior to the receipt of such executed agreement shall be at [Tri–County's] sole risk and responsibility without any liability or obligation whatsoever on the part of ASMC.

3. No representative or employee of ASMC, other than an authorized officer, has the authority to approve, modify or waive the terms of this application.

Borromeo Decl., Ex. 4, 5; Def.'s Rule 56.1 Stmt. ¶¶ 10, 12.

As part of the application process, Zanan and Wu were also supplied with an example of a "Term Dealer Sales and Service Agreement", which noted that an agreement would only "come into full force and effect … when executed by SU-ZUKI." Borromeo Decl., Ex. 2.

On September 10, 2003, Zanan personally delivered the completed dealer applications to Borromeo and ASMC's District Sales Manager, John Bookstaver ("Bookstaver"). During this meeting, Zanan showed Borromeo and Bookstaver three potential site facilities, including 550 Burnside Avenue in Inwood, New York. The Burnside Avenue property contained two buildings: one larger, built out with a showroom, office and a parts and service facility, directly fronting Burnside Avenue and the other smaller, housing a larger central showroom, but set back on the lot away from the street.[3] Def.'s Rule 56.1 Stmt. ¶¶ 14, 16; Pl.'s Counter–Stmt ¶ 16.

Fifteen days later, Borromeo confirmed by letter that at least two of the parts and service facilities viewed by ASMC were "satisfactory in size and operational capacity," but would, in any event, need to be renovated to comply with Suzuki brand specifications. Borromeo also added that "Mr. Zanan needs to move quickly in his selection of a service and parts facility." Def.'s Rule 56.1 Stmt. ¶ 17.

At this point, however, the evidence submitted by the parties notably diverges. ASMC, for its part, asserts that Borromeo "subsequently" learned that Tri–County was proposing the larger and more prominent of the two buildings at the Burnside Avenue property as the site of Tri–County's "exclusive" Suzuki dealership. ASMC contends that, within the automobile industry, the word "exclusive" means that "only one franchise would operate at the site." Def.'s Rule 56.1 Stmt. ¶¶ 18, 19. Tri–County, however, disputes these represen-

---

3. Since the site was fenced and locked, inspection by Borromeo and Bookstaver during Zanan's showing was limited to viewing the site from the facility entrance.

tations, arguing that Borromeo was told only that the "larger showroom"—and not the larger building—was to be assigned to Tri–County's prospective Suzuki dealership and that, within the automobile industry, the word "exclusive" indicates solely that "only one franchise [would] operate in the [particular] showroom," *i.e.*, that exclusivity did not prohibit another franchise selling a different brand from operating out of a different showroom on the same site. Pl.'s Counter–Stmt. ¶¶ 18, 19. In any case, on November 12, 2003, shortly after learning that the dealership was to be "exclusive," Borromeo completed a Dealer Sign Survey Request denoting that both the sales and service components of the dealership would be "exclusive." Def.'s Rule 56.1 Stmt. ¶ 20. In addition, as is required on ASMC's new dealer application, Borromeo prepared a "Facility Standards Addendum," which reflected specifically that the larger building fronting Burnside Avenue would be used for Suzuki's new car sales, parts and service operations. *See* Borromeo Decl., Ex. 9.

Tri–County signed leases for the Burnside Avenue site on November 24, 2003. In correspondence with the owners of the property, Tri–County left open the possibility of locating an additional non-Suzuki dealership on the site: "The use of the premises shall not be limited to a Suzuki new car dealership, but rather, the sales, service and/or leasing of new and used automobiles and/or for any purpose set forth in the Certificate of Occupancy." Def.'s Rule 56.1 Stmt. ¶¶ 21, 22.

On November 25, 2003, the parties agree, Borromeo and Zanan paid a visit to Burnside Avenue to tour the site and discuss logistics. Thereafter, the stories again diverge. ASMC asserts that, during this meeting, Borromeo and Zanan "discussed how the larger showroom, service, and parts building [i.e., the building direct-

ly fronting Burnside Avenue] could be renovated to comply with Suzuki standards." Def.'s Rule 56.1 Stmt. ¶ 23. Zanan, on the other hand, contends that Borromeo was again explicitly "advised that the larger showroom, also known as the central showroom [*i.e.*, the showroom in the building located further back on the lot], would be used for American Suzuki." Pl.'s Counter–Stmt ¶ 23 (citing Zanan Aff.).

The fires of controversy were fanned on December 5, 2003 when, according to ASMC, its District Parts and Service Director, Richard Meyer ("Meyer"), told Borromeo that he "had learned that Tri–County planned on putting the Suzuki dealership in the *smaller* building located at the *rear* of the lot instead of the larger building which was previously discussed." Def.'s Rule 56.1 Stmt. ¶ 24 (emphasis in original). In a letter to Zanan and Wu sent later that same day, Michael Ross ("Ross"), ASMC's Regional Sales Manager, wrote that Tri–County's "intention to dual" the Burnside Avenue site with a non-Suzuki franchise was "not acceptable to Suzuki." Ross asserted that ASMC had been "constant in [its] position regarding exclusivity beginning with the correspondence from Chris Borromeo to you on July 31, 2003." In addition, Ross noted that, in any case, "[t]he proposed service and parts facility at 550 Burnside Avenue ... is not adequate as a dual in size or in physical layout." Borromeo Decl., Ex. 8.

Tri–County's counsel responded to ASMC's rejection of his client's proposal in a letter dated December 16, 2003. Counsel asked that ASMC reconsider its decision, stating that even though the Burnside Avenue site would be dual, "[t]he size of the showroom, quantity of service bays and the number of mechanics will meet all of your criteria and guidelines." He also contended that the site had been "previ-

ously approved by [ASMC]." McMillian Decl., Ex. 7.

Ross wrote back on December 19, 2003. He acknowledged that the Burnside Avenue site had been "surveyed" to determine its "feasibility as a potential Suzuki site," but advised that it had never been formally approved for that purpose by ASMC. Ross then gave several specific justifications for ASMC's rejection of Tri–County's dealership plan:

> Your proposal ... for an exclusive Suzuki sales facility and for a dual in service and parts is not acceptable. The location of the sales facility in the rear of the facility is a secondary position to the main facility. This facility also has little visibility to the street and limited customer traffic flow. The service and parts facility is not properly laid for a dual and does not meet Suzuki requirements.

McMillian Decl., Ex. 6.

Tri–County continued to communicate with ASMC regarding its dealer application for several more weeks. As a part of these negotiations, on January 14, 2004, Tri–County returned to ASMC a copy of the Facility Standards Addendum that Borromeo had previously prepared. This version, signed by Wu, had handwritten alterations reflecting Tri–County's intent to place all of its Suzuki sales operations in the rear building if granted a Suzuki franchise. *See* Borromeo Decl., Ex. 10.

ASMC, in a letter from Borromeo dated January 19, 2004, again rejected Tri–County's proposed facility. Borromeo wrote:

> Due to the material change in your proposed designated showroom for Suzuki at 550 Burnside Avenue ... [ASMC] must turn down your proposed [purchase agreement] with Five Towns Suzuki, Inc. You have significantly changed the original proposal as was discussed between myself and Vladimir Zanan on

November 25, 2003 at the proposed facility location. Your current proposal calls for you to designate the front main showroom for used vehicles which in turn moves Suzuki sales out of the main facility to the adjacent showroom on the side lot. This material change is not an appropriate facility proposal and does not meet the Suzuki facility retail brand image standards.

He also offered that, should Tri–County desire to reinstate its "original commitment," ASMC would "at that time" reevaluate Tri–County's application. Borromeo Decl., Ex. 11.

Simultaneously, it is not contested, Zanan and Wu had been engaged in negotiations for the purchase of a Mitsubishi franchise from an existing Mitsubishi dealer. These negotiations culminated in the signing of a purchase agreement between Tri–County and the Mitsubishi dealer in late 2003 or early 2004. *Compare* Def.'s Rule 56.1 Stmt. ¶ 35 *with* Pl.'s Counter–Stmt. ¶ 35. In April 2004, Airport Auto Group d/b/a Five Towns Mitsubishi, managed by Zanan and Wu and owned by them in conjunction with several other investors, began operating a Mitsubishi dealership out of the larger building fronting Burnside Avenue. Def.'s Rule 56.1 Stmt. ¶ 36.

Tri–County filed the instant action in March 2004, asserting claims against ASMC for 1) breach of contract, or alternatively, under a promissory estoppel theory, 2) tortious interference with the purchase agreement between Tri–County and Five Towns Suzuki, and 3) unfair business practices in violation of the New York State Franchised Motor Vehicle Dealer Act.

## II. Standard for Summary Judgment

Under the Federal Rules of Civil Procedure, a district court may grant summary judgment upon finding that "there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court's responsibility in assessing the merits of a summary judgment motion is thus not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.,* 73 F.3d 13, 16 (2d Cir.1995) (quoting *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 244 (2d Cir. 1984)). Accordingly, the moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, *see, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005), and the evidence presented will be construed liberally in favor of the party opposing the motion. *See, e.g., Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004).

Once the moving party has met its initial burden of demonstrating the absence of a disputed issue of material fact, the burden then shifts to the nonmoving party to present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). However, the nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Thus, if the evidence favoring the nonmoving party is "merely colorable ... or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### III. ASMC's Motion for Summary Judgment

#### A. *Breach of Contract*

Acknowledging that a formal franchise agreement was never executed by the par-

ties, TriCounty nevertheless argues that "Suzuki's approval of a site location, and Tri–County's subsequent execution of leases for that location, created a binding contract between the parties, the terms of which were set forth in the dealership application and accompanying documents." Pl.'s Mem. in Opp. at 3. Therefore, Tri–County asserts, a "franchise agreement" exists "under the customs and practices of the automobile dealership industry," entitling Tri–County to lost profits resulting from ASMC's breach of that agreement. *Id.* at 8. Presented front and center is whether a course of conduct designed to culminate in an executed formal agreement did nonetheless become contractually binding in and of itself without execution of a formal agreement.

█ "It is an elemental principle of contract law that no contract can be formed unless the parties intend to be bound." *Ogden Martin Sys. of Tulsa, Inc. v. Tri–Cont'l Leasing Corp.,* 734 F.Supp. 1057, 1066 (S.D.N.Y.1990)(citing *Winston v. Mediafare Entm't Corp.,* 777 F.2d 78, 80 (2d Cir.1985)); *cf. R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984)(noting that "[u]nder New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs"). This rule holds true even if the parties have orally agreed upon all essential terms of the proposed contract. *See, e.g., Schwartz v. Greenberg,* 304 N.Y. 250, 107 N.E.2d 65 (1952); *Philips Credit Corp. v. Regent Health Group, Inc.,* 953 F.Supp. 482, 509 (S.D.N.Y.1997). For the ordinary rule is clear: "where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Adjustrite Systems, Inc. v. GAB Business Services, Inc.,* 145 F.3d 543, 548 (2d Cir.1998).

■ On the other hand, where all contract terms have been agreed upon, leaving nothing for "future settlement," and "there is no understanding that an agreement should not be binding until reduced to writing and formally executed," an informal agreement can be binding even though the parties contemplated ultimately memorializing their contract in a formal document. *R.G. Group*, 751 F.2d at 74 (citing *Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143, 1145 (1979)). "The point of these rules is to give parties the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain 'complete immunity from all obligation' until a written agreement is executed." *Philips*, 953 F.Supp. at 513 (citing 1 ARTHUR CORBIN, CORBIN ON CONTRACTS § 30, at 98 (1963)).

■ Courts confronted with the question of whether there is a preliminary agreement, and, if so, whether it creates a binding contract, must look first to "the intent of the parties: whether the parties intended to be bound, and if so, to what extent." *Adjustrite*, 145 F.3d at 548–49. And, to discern that intent, a court must look at threshold to the "parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances.'" *R.G. Group*, 751 F.2d at 74; *see also Winston*, 777 F.2d at 80. Where objective evidence of intent is manifested, subjective evidence of intent should generally not be considered at all. *See, e.g., Rule v. Brine, Inc.*, 85 F.3d 1002, 1010 (2d Cir.1996)(citing *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 351, 361 N.E.2d 999 (1977)).

The Second Circuit has identified the following factors as particularly relevant to a determination of whether the parties intended to be bound in the absence of a fully executed and formal written agreement:

(1) whether there has been an express reservation of the right not to be bound in the absence of a formal writing; (2) whether there has been partial performance of the alleged contract; (3) whether all of the terms of the contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to a final writing.

*Winston*, 777 F.2d at 80; *see also Kreiss v. McCown DeLeeuw & Co.*, 37 F.Supp.2d 294, 299–300 (S.D.N.Y.1999).

■ The first factor—the language of the preliminary documentation—is "the most important." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989). Indeed, it is not only first because of preeminent importance, but because it can be preclusive; if the language "is clear that the parties did not intend to be bound, the [c]ourt need look no further." *Cohen v. Lehman Bros. Bank, FSB*, 273 F.Supp.2d 524, 528 (S.D.N.Y. 2003). Applying these factors to the case at bar, the evidence not only on the first but on each of the factors unequivocally supports ASMC's contention that it did not intend to be bound by the submission of a dealership application and related documentation. As to that fact, the language of the preliminary documentation agreed to and executed by both parties could lead a reasonable finder of fact to no other conclusion.

■ To start, it is undisputed that Borromeo specifically advised in his cover letter to Zanan and Wu's attorney that the completion of the dealership application materials attached to the letter was necessary to "evaluate" his clients' expertise and

reputation in various areas, and that "final approval/disapproval [of the dealer applications] will be at the sole discretion of [ASMC's] Executive Management in Brea, California." Borromeo Decl., Ex. 3. This precise, written declaration by Borromeo simply cannot be contorted into evidence that the dealership application itself was intended to be a binding contract; it signals quite the contrary—that the dealership application was only the first step towards a contemplated formal franchise agreement between ASMC and Tri–County.

 Even more dispositive is the language of the dealership application. The application stated prominently that "[t]he receipt by ASMC of this application does not obligate ASMC in any way to enter into [a franchise agreement]" and that "[n]o act other than the formal execution of [a franchise agreement] by an officer of ASMC shall constitute approval of the application [by] ASMC. . . ." Borromeo Decl., Ex. 5. In contract law, it is well-established that "a party that does not wish to be bound at the time of the preliminary exchange of letters [or other documents] can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement.' " *Teachers Ins. and Annuity Ass'n of America v. Tribune Co.*, 670 F.Supp. 491, 499 (S.D.N.Y.1987). In this same vein, "considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed." *R.G. Group*, 751 F.2d at 75.

Here, ASMC not only made clear that its ultimate acceptance of Tri–County's application would be contingent upon a number of factors—such as, *inter alia*, its evaluation of Zanan and Wu's "expertise" and "reputation" as well as the final approval of the overall application package by executive management in California—but also included unequivocal language in the application itself stating that no act other than the formal execution of a franchise agreement by ASMC could lead to a binding commitment on the part of ASMC. Through these representations, ASMC explicitly reserved its right not to be bound to, or even enter into, any form of agreement with Tri–County absent such approval and the subsequent execution of a formal franchise agreement. Consequently, no binding agreement could have arisen simply out of the completed dealer application and accompanying documents. *See, e.g., Lehman Bros. Bank*, 273 F.Supp.2d at 529 (granting summary judgment; loan application specifically stated that it was "not a commitment to lend"); *Ogden Martin*, 734 F.Supp. at 1069. Tri–County protests now, but offers not a shred of evidence, that it either did not understand the meaning of these simple terms or did not agree to accept them at the time.

 The three remaining factors, though of no significance in light of ASMC's express written reservation not to be bound, also counsel against a finding that the dealership application and accompanying documents created a binding franchise agreement. Specifically, Tri–County's claim of partial performance under the alleged contract by entering into a lease for the Burnside Avenue property, *see* Pl.'s Mem. in Opp. at 18–19, does not past muster. The leasing of the proposed dealership site can be characterized, at most, as a "preparatory act" since there is no evidence that this leasing conferred any benefit whatsoever on ASMC. *See, e.g., Shearson Lehman CMO, Inc. v. TCF Banking and Savings, F.A.*, 710 F.Supp. 67, 71 (S.D.N.Y.1989)(in order for there to be partial performance, a party must confer something of value on the other party which that party accepts); *see also R.G. Group*, 751 F.2d at 76 (plaintiff's prepara-

tory act of forming a limited partnership to facilitate a transaction is not partial performance).

The third factor—the existence of open terms—also weighs strongly in favor of ASMC. "There is a strong presumption against finding binding obligation in [documents] which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Tribune Co.*, 670 F.Supp. at 499. Crediting plaintiff's version of the facts, it is clear that the parties never had a true meeting of the minds with regard to where the Suzuki showroom was to be located on the Burnside Avenue site. Nor is there quarrel between the parties that agreement on showroom, lot and service department operational details is key in a transaction of this nature; one likely not to have been left unspecified in an actual written contract. Oddly, the fact that the parties disagree about what Borromeo was told regarding the showroom does not help Tri–County on this motion because the ASMC decisionmakers to whom Borromeo reported, there is no evidence to dispute, had a different understanding about the showroom than Tri–County's principals, which only serves to confirm the absence of contract as ASMC contends. *See R.G. Group*, 751 F.2d at 76–77 (concluding that no contract existed, in part because defendant's counsel incorrectly believed that issue of potential franchisee's territorial limitations had been settled, thus leaving an important term open); *see also Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 325 (2d Cir.1997).

Lastly, the fourth factor—whether the agreement allegedly entered into would be of a type that would normally be committed to a formal writing—also strongly supports ASMC's position that it had no intent to be bound by the application and accompanying documentation. Perhaps most telling is the fact that franchise agreements are complex in that they often cover a wide variety of matters such as, *inter alia*, the franchisee's capital structure, lot and facility specifications, trade secrets, and the parties' respective rights upon termination or default. The transaction also involved a large amount of money; Tri–County's initial investment alone, had the underlying purchase agreement between Tri–County and Five Towns Suzuki been approved, could have been for well over $600,000. As such, any agreement between the parties "clearly [would have been] of the type that ordinarily would be committed not only to a writing but to a formal contract replete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts." *Adjustrite*, 145 F.3d at 551; *see also R.G. Group*, 751 F.2d at 77 (noting that it certainly could have been of no "surprise" to a potential franchisee that any franchise agreement be formal and "in writing and signed" due to the complexity of the contract and the amount of money at stake).[4]

---

4. Tri–County's assertion that "it is the custom and practice of the automotive dealership industry to reach a dealership agreement prior to the *pro forma* completion and approval of the dealership application," *see* Pl.'s Mem. in Opp. at 20–21, is not only vague but unsupported by the evidence submitted. Tri–County, moreover, cites no case directly on point (*i.e.*, involving the customs and practices of the automobile industry); instead, it cites a case involving the customs and practices of the shipping industry where, as explained in a footnote, parties "typically base their negotiations on a standard form contract" which is then customized to the parties' specifications to reach a binding contract on the "main terms" known as a "fixture." *See Herlofson Mgmt. A/S and Ministry of Supply, Kingdom of Jordan*, 765 F.Supp. 78, 80 n. 1 (S.D.N.Y. 1991). However, even assuming *arguendo*

Whether based solely on the preeminent first factor recognized by New York courts and the Circuit in determining whether the parties to an alleged agreement governed by New York law intended to be bound absent a fully executed, formal written contract or on all four recognized factors, there is no triable issue—it is clear beyond cavil from the unchallenged evidence that Tri–County and ASMC never entered into a binding franchise agreement.[5] Summary judgment, therefore, must be and is granted in favor of ASMC with regard to Tri–County's breach of contract claim.

### B. *Promissory Estoppel*

As an alternative to its breach of contract claims, Tri–County seeks damages under a promissory estoppel theory; arguing that ASMC "promised Tri–County that [ASMC] would not unreasonably withhold its consent to the [purchase agreement] and to Tri–County's dealership application." Compl. ¶ 41.

■ In order to recover under a promissory estoppel theory in New York, a plaintiff must show: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance by the party to whom the promise is made; and 3) an injury sustained by the party asserting the estoppel by reason of his reliance. *Ripple's of Clearview, Inc. v. Le Havre Associates*, 88 A.D.2d 120, 452 N.Y.S.2d 447, 449 (1982); *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir.1995). In addition, even if a plaintiff is able to establish promissory estoppel, New York courts have further restricted the application of the theory, so as not to undermine the important policies underlying the Statute of Frauds, to the limited class of cases in which "the circumstances are such as to render it unconscionable" to refuse to enforce the promise upon which the promisee has relied. *Sterling Interiors Group, Inc. v. Haworth, Inc.*, 1996 WL 426379, at *21 (July 30, 1996)(citing *Philo Smith & Co., Inc. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir.1977)); *see also D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 99 A.D.2d 522, 471 N.Y.S.2d 299, 302 (2d Dep't 1984). It is a standard Tri–County cannot meet.

■ To go to the heart of it, Tri–County's promissory estoppel claim fails as a matter of law because it cannot show that ASMC either made a clear and ambiguous promise to award it a franchise or that its reliance on the alleged promise was reasonable and foreseeable. Although Tri–County is correct in that Borromeo's July 31, 2003 letter did assure Tri–County's attorney that "no dealer candidate will be unreasonably denied," *see* Borromeo Decl., Ex. 3, this nonspecific pledge of reasonableness simply cannot be construed as a clear and unambiguous promise that Tri–County would be awarded an ASMC franchise. *See, e.g., Lehman Bros. Bank*, 273 F.Supp.2d at 529–30 (potential lender's statement that the parties would "work through" the issues not a clear and unambiguous promise to make a loan); *Rosen v. Hyundai Group (Korea)*, 829 F.Supp. 41, 48 (E.D.N.Y.1993)(promise to "do everything possible" did not amount to a clear and unambiguous promise).

---

that Tri–County was able to show that a similar custom existed in the automobile industry, this argument would nevertheless be to no avail because here, unlike in *Herlofson*, a) ASMC had clearly expressed its intention not to be bound absent a formalized final agreement, thus overriding any such "custom" and b) at least one "main term"—the actual location of the facility—remained open because of mutual misunderstanding.

5. In light of its finding that no contract existed, the Court need not, and does not, reach ASMC's remaining arguments under the Statute of Frauds.

■ In any event, no reasonable trier of fact could find Zanan and Wu's claimed reliance on Borromeo's comment reasonable and foreseeable given ASMC's unequivocal and undeniable written advice throughout the negotiations that ASMC would not be bound by anything but a formalized written franchise agreement. Indeed, the dealership applications—which were filled out and signed shortly thereafter by both Zanan and Wu—specifically stated that "[n]o act other than the formal execution of [a franchise agreement] by an officer of ASMC shall constitute approval of the application [by] ASMC" and that "any action taken, any expenditures made, or commitments assumed by [Tri–County] prior to the receipt of such executed agreement shall be at [Tri–County's] sole risk and responsibility without any liability or obligation whatsoever on the part of ASMC." Borromeo Decl., Ex. 4, 5. Moreover, Borromeo had also previously informed Zanan and Wu, it is not disputed, that approval of the applications themselves would be at the "sole discretion" of ASMC executive management in California. Borromeo Decl., Ex. 3. One conclusion is inescapable on the facts alleged by plaintiff—any act that Tri–County took hanging its hat on Borromeo's pledge of reasonableness knowing that it was a pledge of reasonableness and nothing more, knowing that the formal award of a dealership was not guaranteed, it took at its own risk. *See, e.g., Sanyo Electric, Inc. v. Pinros & Gar Corp.*, 174 A.D.2d 452, 571 N.Y.S.2d 237, 238 (1st Dep't 1991)(finding plaintiff's reliance on alleged oral promise to enter into a distributorship agreement to be "unreasonable and unwarranted" in light of conceded vagueness of promise and the fact that defendant had made clear in written representations that any such agreement would be terminable at will).

■ Finally, even assuming that Zanan and Wu had relied on Borromeo's alleged promise to their detriment, they would not be entitled to relief by promissory estoppel absent a showing of unconscionable injury. *See, e.g., Philo Smith*, 554 F.2d at 36 (noting that in order to overcome the Statute of Frauds, a plaintiff must allege injury resulting from its reliance that is of "such an extent and so substantial in quality as to irremediably alter his situation and make the interposition of the statute against performance a fraud")(internal citations omitted). No such showing of unreasonableness has been made here. As the dealership applications establish, Zanan and Wu were not unsophisticated individuals, and, more significantly, were able to secure a Mitsubishi franchise for the very same Burnside Avenue location allegedly leased in reliance on ASMC's promise at around the time their negotiations with ASMC failed. Summary judgment in favor of ASMC on the promissory estoppel claim is thus appropriate as well.

C. *Tortious Interference with Contractual Relations*

Tri–County also asserts that, by refusing to approve it, ASMC "tortiously interfered" with its purchase agreement with Five Towns Suzuki. Compl. ¶ 50. This purchase agreement was, as noted above, contingent upon the approval by ASMC of Tri–County as a franchisee. *See* Def.'s Rule 56.1 Stmt. ¶¶ 6, 7; Borromeo Decl., Ex. 1.

■ To establish the tort of intentional interference with the performance of a contract under New York law, a plaintiff must show: 1) the existence of a valid contract between plaintiff and a third party, 2) defendant's knowledge of the contract, 3) defendant's intentional procurement of the third party's breach of the contract without justification, and 4) dam-

ages resulting therefrom. *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 646 N.Y.S.2d 76, 81, 668 N.E.2d 1370 (1996); *Hoag v. Chancellor, Inc.,* 246 A.D.2d 224, 677 N.Y.S.2d 531, 533 (1st Dep't 1998); *Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996).

The first and third elements are fatal to Tri–County's claim. To begin with, Tri–County did not have a binding contractual relationship with Five Towns Suzuki given that the purchase agreement was expressly contingent upon ASMC's approval of the transactions. Tri–County had no more than an expectation of final contractual relations with Five Towns Suzuki. Such an expectation does not under New York law suffice to sustain a claim of tortious interference with a contract. *See, e.g., Chu v. Dunkin' Donuts Inc.,* 27 F.Supp.2d 171, 173–74 (E.D.N.Y.1998) (potential franchisee had only an expectation of contractual relations with former franchisee, and thus could not sustain a claim of tortious interference with contract against franchisor, when franchisor refused to approve a sale agreement between potential and former franchisees that was expressly contingent upon franchisor's approval); *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 641 N.Y.S.2d 581, 585, 664 N.E.2d 492 (1996)(unsuccessful bidder in merger could not maintain suit against an opposing bidder alleging tortious interference with its contractual relations with a target company where merger agreement between unsuccessful bidder and target company was contingent upon approval by target's shareholders on the basis that unsuccessful bidder had only an "expectation of contractual relations"); *see also Levine v. Yokell,* 245 A.D.2d 138, 665 N.Y.S.2d 962, 962 (1st Dep't 1997).[6]

Tri–County's claim also founders on the third element—*i.e.,* that ASMC unjustifiably "interfered" with the purchase agreement between Tri–County and Five Towns Suzuki. "An action for tortious interference with contract ... does not lie where the only interference alleged is the defendant's refusal to approve a plaintiff's purchase application and that contingency is specifically contemplated in the contract of sale." *Chu,* 27 F.Supp.2d at 173. Because the "contract of sale" between Tri–County and Five Towns Suzuki was, as noted above, expressly contingent upon ASMC's approval of the transfer, *see* Borromeo Decl., Ex. 1, ASMC can incur no liability for tortious interference by simply exercising its right to not approve the sale transaction. *See, e.g., Chu,* 27 F.Supp.2d at 173–74; *Morse v. Ted Cadillac, Inc.,* 146 A.D.2d 756, 757, 537 N.Y.S.2d 239, 240 (2nd Dep't 1989)(auto manufacturer's exercise of right not to enter into dealership franchise agreement with plaintiff does not amount to "interference" with contractual relations between plaintiff and another franchisee); *State Street,* 246 F.Supp.2d at 255; *Pierce Ford Sales, Inc. v. Ford Motor Co.,* 299 F.2d 425, 429 (2d Cir.1962). As such, summary judgment is appropriate on the law in fa-

6. Moreover, even "generously construing" Tri–County's claim as one for interference with a prospective business relationship does not salvage the claim. In order to establish such a claim, Tri–County would have to demonstrate "fraud, misrepresentation, threats of violence or other wrongful conduct" on the part of ASMC. *Chu,* 27 F.Supp.2d at 174; *see also State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada,* 246 F.Supp.2d 231, 255 (S.D.N.Y.2002)(internal citations omitted)(noting that a plaintiff must meet the high burden of showing that a defendant "acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means" in order to establish a claim for tortious interference with prospective contractual relations under New York law). TriCounty has not even alleged such conduct much less offered credible evidence of it.

vor of ASMC with regard to the claim of tortious interference with contract.

D. *Claims of Unfair Business Practices under New York State Franchised Motor Dealer Act*

 Finally, Tri–County asserts that, by denying its dealership application, ASMC engaged in "unfair business practice[s]" in violation of the New York State Franchised Motor Vehicle Dealer Act ("FMVDA"). Compl. ¶ 55. Essentially, Tri–County claims that ASMC violated § 463(2)(k) of this act by failing to provide "specific reasons for its withholding of written consent to the [purchase agreement] within 60 days of the time that request for such consent and delivery to Suzuki of the necessary documentation was made." *Id.* ¶ 53.

Because Tri–County was at no time, as this Court has now found, a franchised Suzuki motor vehicle dealer, Tri–County has no standing to sue under FMVDA. A "franchised motor vehicle dealer," as defined in the FMVDA, is "any person ... who has been granted a franchise as defined in subdivision six of this section," N.Y. VEH. & TRAF. § 462(7)(McKinney 2006), with a "franchise" being defined as "a written arrangement for a definite or indefinite period in which a manufacturer or distributor grants to a franchised motor vehicle dealer a license to use a trade name, service mark or related characteristic." *Id.* As only a proposed purchaser of a franchise dealership, Tri–County—an entity which was concededly formed for the sole purpose of obtaining the franchise—was not yet a "franchised motor vehicle dealer" within the meaning of FMVDA. *See, e.g., Bevilacque v. Ford Motor Co.,* 125 A.D.2d 516, 520, 509 N.Y.S.2d 595, 600 (2nd Dep't 1986)(dismissing plaintiff's claims under FMVDA after finding that plaintiff, a prospective purchaser of an in-

terest in an automobile dealership, had not demonstrated that he was already a franchised motor vehicle dealer). As such, Tri–County lacks standing to sue under FMVDA, and all of its claims under this act must, therefore, be dismissed.

**IV. Tri–County's Motion for Sanctions**

The Court will next address Tri–County's motion for an order striking ASMC's answer, or, alternatively, imposing sanctions, against ASMC on the grounds that ASMC spoliated evidence and committed other discovery abuses. Specifically, Tri–County alleges that ASMC deleted e-mails concerning Tri–County's dealership application that "likely reveal that [ASMC] had no meritorious reason for reneging on Tri–County's application." Pl.'s Mem. in Supp. at 7. Tri–County also alleges that ASMC engaged in other discovery abuses such as producing documents late and providing incomplete answers to interrogatories. Hence, Tri–County argues, it is entitled to an order striking ASMC's answer or, in the alternative, imposing an adverse inference with respect to the allegedly spoliated e-mails and/or imposing sanctions upon ASMC for the other alleged discovery abuses.

 Spoliation is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999). Courts have the authority to impose sanctions for spoliation pursuant to Rule 37(b) of the Federal Rules of Civil Procedure as well as pursuant to their own inherent power. *See generally* FED.R.CIV.P. 37(b); *Residential Funding Corp. v. Degeorge Fin. Corp.,* 306 F.3d 99, 106–07 (2d Cir.2002). The Second Circuit has identified three factors necessary to make out a claim for spoliation: 1) that the party with control over the evi-

dence had a duty to preserve it when it was lost or destroyed; 2) that the evidence was lost or destroyed with a "culpable state of mind"; and 3) that the evidence was relevant. *Smith v. City of New York,* 388 F.Supp.2d 179, 189 (S.D.N.Y.2005)(citing *Degeorge,* 306 F.3d at 107). The party moving for sanctions bears the burden of establishing all three of these elements. *Id.; see also Byrnie v. Town of Cromwell Board of Educ.,* 243 F.3d 93, 109 (2d Cir. 2001).

■■■ As an initial matter, the Court observes that Tri–County has not proffered a scintilla of evidence that the alleged missing e-mails ever existed in the first place. Tri–County simply speculates that they *may have* existed given "Suzuki's [allegedly] clear pattern of creating lies about Tri–County's application and [of] withholding prejudicial documents," as well as the fact that, it claims, Borromeo was a more frequent user of e-mail than he acknowledged at deposition. *See generally* Pl.'s Mem. in Supp. Such speculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence. *See, e.g., Alaimo v. Trans World Airlines, Inc.,* 2005 WL 267558, at *3 (S.D.N.Y. Feb.3, 2005)("since plaintiff has not establish[ed] that the records and documents she sought ever existed, there can be no finding of spoliation of evidence"); *Nin v. Liao,* 2004 WL 2848520, at *6 (S.D.N.Y. Dec.9, 2004)(same).

More critically, even assuming *arguendo* that the alleged e-mails at one time existed, TriCounty would still be unable to sustain a claim for spoliation of evidence as it cannot establish any of the three required elements. As to the first and second elements, there is no credible evidence that ASMC failed to preserve e-mails or other relevant evidence prior to the date it was on notice that litigation might be com-

menced. While there is some evidence that ASMC may have accidentally overwritten, in the ordinary course of business, two monthly backup tapes it kept of its e-mail system well after the commencement of litigation, Tri–County offers no evidence to refute ASMC's assertion that, by the time of such an overwriting, it had already produced all responsive e-mails from these two months via its normal network servers. And, of course, as to the third—Tri–County has also proffered no evidence that any of the allegedly lost e-mails would have been relevant to this litigation. Indeed, although Tri–County speculates, as noted above, that such e-mails would have "likely reveal[ed] that [ASMC] had no meritorious reason for reneging on Tri–County's application," this would be of no consequence in light of this Court's finding that no reasonable finder of fact could conclude that ASMC had any intention to be bound absent formal written contract; the hypothetical evidence would, at best, provide reason and context for ASMC's decision but no basis for relief from it. Thus, no sanction for spoliation of evidence can lie.

■■■ The Court also finds no merit to Tri–County's argument that sanctions are warranted, at this late stage, against ASMC for its other alleged misconduct during discovery, including its allegedly delayed production of relevant documents and incomplete answers to interrogatories. First, Tri–County has presented no evidence that any of these alleged "abuses," even if they did occur, were the result of bad faith, willful misconduct or even gross negligence on the part of ASMC, or that they in any way prejudiced Tri–County. *Cf. Henkel Corp. v. Polyglass USA, Inc.,* 194 F.R.D. 454, 456 (E.D.N.Y.2000)(noting that even if discovery abuses have occurred, the court must take into account the "degree of [the offending] party's cul-

pability and the amount of prejudice caused by its actions" in deciding whether and what sanctions are warranted). More dispositively, the record reveals that the issues now raised by Tri–County were neither brought to the attention of Magistrate Judge Matsumoto nor were they the subject of an appeal during discovery. It is, quite simply, too late to raise them now. *See, e.g., Glenn v. Scott Paper Co.,* 1993 WL 431161, at \*17 n. 3 (D.N.J. Oct.20, 1993)(finding plaintiff's motion for sanctions untimely when no motion to compel or for sanctions had been brought during discovery, and accusations were first leveled while defending summary judgment motion); *Ali v. A & G Co., Inc.,* 542 F.2d 595, 596 (2d Cir.1976). Tri–County's motion for sanctions is, accordingly, denied.

## V. Conclusion

For the reasons set forth above, defendant American Suzuki Motor Corporation's motion for summary judgment is granted. Plaintiff Tri–County Motors, Inc.'s motion for sanctions is denied. The Clerk is directed to enter judgment accordingly and to close this case.

SO ORDERED.